IN THE SUPREME COURT OF TENNESSEE
AT MEMPHIS
November 4, 2010 Session

**STATE OF TENNESSEE v. RICHARD ODOM**

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 91-07049      Chris Craft, Judge**

**No. W2008-02464-SC-DDT-DD - Filed March 3, 2011**

The defendant was convicted of first-degree murder in the perpetration of rape. In the penalty phase of the trial, the jury imposed a sentence of death, finding three aggravating circumstances beyond a reasonable doubt: (1) the defendant was previously convicted of one or more violent felonies; (2) the murder was especially heinous, atrocious, or cruel; and (3) the murder was committed during the defendant's escape from lawful custody or from a place of lawful confinement. The Court of Criminal Appeals affirmed the conviction, but reversed the death sentence, holding that the trial court's limitation on the mitigating evidence during the penalty phase required a new sentencing hearing. This Court affirmed. A second jury sentenced the defendant to death, concluding that the single aggravating circumstance, that the defendant had previously been convicted of one or more violent felonies, outweighed the mitigating circumstances beyond a reasonable doubt. The Court of Criminal Appeals affirmed. This Court reversed, holding that because the trial court had erroneously admitted detailed evidence of the defendant's prior violent felony offense, a third sentencing hearing was required. The jury again imposed a sentence of death, concluding that two statutory aggravating factors, that the defendant had been previously convicted of a felony involving the use of violence to the person and that the murder was committed while the defendant was engaged in the commission of a robbery, had been established beyond a reasonable doubt, and further determining that the aggravating circumstances outweighed the evidence of the mitigating circumstances beyond a reasonable doubt. This sentence was affirmed by the Court of Criminal Appeals. Upon careful review of the entire record, we hold as follows: (1) the defendant's constitutional right to a fair and impartial jury was not violated by the disqualification of a prospective juror; (2) the prosecutor's closing argument did not result in the use of non-statutory aggravating factors in the jury's weighing process warranting reversal of the death sentence; (3) the admission of photographs of the body did not constitute error; (4) the trial court's instructions on parole did not violate the defendant's right to due process of law and heightened reliability; (5) the mandatory criteria of Tennessee Code Annotated section 39-13-206(c)(1) are satisfied; and (6) the reduction of the amount

of compensation sought by appellate defense counsel by a judge on the Court of Criminal Appeals did not require his disqualification from participating in this case. The judgment of the Court of Criminal Appeals is, therefore, affirmed.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the Court of Criminal Appeals is Affirmed**

GARY R. WADE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Brock Mehler, Nashville, Tennessee and Gerald Skahan, Memphis, Tennessee, for the appellant, Richard Odom.

Robert E. Cooper, Jr., Attorney General and Reporter; James E. Gaylord, Assistant Attorney General; William L. Gibbons, District Attorney General, for the appellee, the State of Tennessee.

**OPINION**
**Procedural Background**

On May 10, 1991, Richard Odom (the "Defendant") raped and stabbed to death Mina Ethel Johnson (the "victim") in a Memphis parking garage. A year later, he was convicted of first-degree murder committed in the perpetration of rape. See State v. Odom, 928 S.W.2d 18, 20 (Tenn. 1996) ("Odom I"). The jury found three aggravating circumstances beyond a reasonable doubt: (1) the Defendant was "previously convicted of one or more violent felonies; (2) the murder was especially heinous, atrocious, or cruel; and (3) the murder was committed during the [D]efendant's escape from lawful custody or from a place of lawful confinement." Id. at 20-21 (citing Tenn. Code Ann. § 39-13-204(i)(2), (5), (8) (Supp. 1995)). After determining that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt, the jury sentenced the Defendant to death by electrocution. Id. at 21. Our Court of Criminal Appeals affirmed the conviction but reversed the death sentence and ordered a second sentencing hearing. See State v. Odom, No. 02C01-9305-CR-00080, 1994 Tenn. Crim. App. LEXIS 689, at *2 (Tenn. Crim. App. Oct. 19, 1994).

This Court affirmed the Court of Criminal Appeals' determination that the trial court had erred during the penalty phase by excluding mitigating evidence in the form of a doctor's testimony and by improperly instructing the jury as to non-statutory mitigating circumstances. However, this Court further held that the evidence was insufficient to support the jury's determination that the murder was especially heinous, atrocious or cruel and that there was "no justification" to support its finding that the murder was committed by the Defendant

while he was in lawful custody or in a place of lawful confinement or during the Defendant's escape from lawful custody or confinement. Odom I, 928 S.W.2d at 21, 27.

On remand, the second jury also sentenced the Defendant to death, concluding that a single applicable aggravating circumstance, that the Defendant had previously been convicted of one or more violent felonies, outweighed the mitigating circumstances beyond a reasonable doubt. State v. Odom, 137 S.W.3d 572, 575 (Tenn. 2004) ("Odom II"). The Court of Criminal Appeals affirmed the sentence of death. State v. Odom, No. W2000-02301-CCA-R3-DD, 2002 Tenn. Crim. App. LEXIS 871, at *131 (Tenn. Crim. App. Oct. 15, 2002). On appeal, this Court ordered a third sentencing hearing, holding that the trial court had erroneously admitted "detailed and graphic evidence" of the Defendant's prior violent felony offense.[1] Odom II, 137 S.W.3d at 586-87.

### Third Sentencing Hearing

At the third sentencing hearing, the State offered proof that at approximately 1:15 p.m. on the date of her murder, the victim, a seventy-eight-year-old woman, left the residence of her sister, Mary Louise Long,[2] for an appointment with Dr. Stanley Zellner, a podiatrist. When the victim had not returned by 4:30 p.m., Ms. Long called Dr. Zellner, who informed her that the victim had failed to attend her scheduled appointment. Ms. Long first telephoned the police department to report the victim's disappearance and then contacted John Sullivan, a long-time acquaintance, who agreed to help look for the victim. The two "traced the route" the victim had to drive and found her car in a parking garage. When Sullivan approached the vehicle, he observed the body of the victim on the floor of the backseat. After returning to the car, he did not inform Ms. Long what he had seen, explaining that "she was a very nervous, high strung person." As he drove out of the parking garage, Sullivan encountered a police car parked on a nearby street and told the officer where he could find the body. Sullivan then drove Ms. Long to her residence before returning to the crime scene to provide the police with a statement.

---

[1] The trial court applied a 1998 amendment to Tennessee Code Annotated section 39-13-204(c), which "allowed the prosecution to prove the facts and circumstances of . . . [a] prior felon[y] . . . to establish the aggravating circumstance in Tennessee Code Annotated section 39-13-204(i)(2)." Odom II, 137 S.W.3d at 580; see also Act of Apr. 23, 1998, ch. 915, § 1, 1998 Tenn. Pub. Acts 646, 646. However, the previous version of the statute, which was in effect at the time of this offense in 1991, did not permit such proof. See Tenn. Code Ann. § 39-13-204(c) (1991). This Court had "consistently held that it was 'not appropriate to admit evidence regarding specific facts of the crime resulting in the previous conviction, when the conviction on its face shows that it involved violence or the threat of violence to the person.'" Odom II, 137 S.W.3d at 580 (quoting State v. Bigbee, 885 S.W.2d 797, 811 (Tenn. 1994)). The trial court's retroactive application of the 1998 amendment ran afoul of our decision in State v. Powers, 101 S.W.3d 383 (Tenn. 2003).

[2] Ms. Long died prior to the third sentencing hearing. Her testimony at the initial proceeding was read into evidence.

Donna Michelle Locastro, who was employed by the Memphis Police Department at the time of the murder, had taken Ms. Long's missing person's call prior to the discovery of the body. She and her partner, Don Crowe, first called the local hospitals, the city wrecker dispatch, and the traffic bureau before setting out on the route the victim would have driven to her appointment. The officers arrived at the parking garage at approximately 8:00 p.m., shortly after Sullivan had discovered the body. When Officer Locastro looked inside the vehicle, she noticed what appeared to be blood on the right front passenger's seat and a wallet wedged between the emergency brake and the driver's seat. She also saw that the victim was clutching what appeared to be a check in her left hand. She and other officers secured the area and contacted the homicide unit.

Detective Ronnie McWilliams, who was assigned to the case on the day after the murder, testified that a fingerprint found in the vehicle led to the identification of "Otis Smith" as a potential suspect. Three days after the murder, "Smith" was arrested. He had in his possession an "Old Timer's Light Blade Knife," which had a fold-out blade of over four inches. During the arrest, Detective McWilliams informed "Smith" of his rights. When he signed a waiver, however, Detective McWilliams observed that "Smith" had started to sign another name. Later, when his true identity was established, "Smith" signed a second waiver under the name Richard Odom.

In a written statement to the police, the Defendant, thirty years old at the time and unemployed, admitted killing the victim and provided details of the crime. He stated that just before the murder, he was in the stairwell trying to relax. When another individual entered the stairway, he entered the garage area at the same time the victim arrived. Claiming that he intended only to steal her purse so he could "get something to eat and catch a nap," he told officers that when he ran over to grab her purse, he "somehow grabbed her arm or hand or whatever and we kind of fell back into the car." He stated that he always kept his knife open because of potential danger in the area and that "somehow or another," while "[p]ushing the lady off of me and over the back seat . . . [,] I managed to . . . cut her, I guess." The Defendant also told the police that when "[t]he lady called me, son, . . . I told her, I would give her a son [and] I went to the back . . . seat with her. I don't know if I stabbed her when I got in the back seat with her or when I got back in the front seat." The Defendant admitted that he raped the victim and insisted that she was still alive at the time, claiming that she remarked that she had never had sex before. He told police that he could not remember whether he had stabbed the victim again after the rape. The Defendant acknowledged searching the victim's purse and wallet, but claimed that he found nothing of value and left the items in the car. While admitting that he took the victim's car keys, he stated that he threw them away as he left the parking garage. At the conclusion of his interrogation, the Defendant remarked, "I need help mentally and psychologically, something I can't express just freely and openly."

-4-

Dr. Jerry Thomas Francisco, the Shelby County Medical Examiner at the time of the murder, conducted the autopsy. He found a stab wound at the front of the victim's chest and two on the right side of her body towards the back. He also observed cuts on the victim's right hand, which he described as defensive wounds. The knife wound to the front of her chest passed into the right side of the heart, causing two tears which, in turn, caused blood to accumulate in the heart cavity and the left side of her chest. A wound near the side penetrated her chest cavity and produced a tear in the lung, which caused bleeding in the lung cavity. The other wound to the side passed through her abdominal cavity into the liver, which produced bleeding in the peritoneal cavity. Dr. Francisco, who determined that the victim was 5 feet 6 inches in height and weighed 113 pounds, characterized each of the three wounds as lethal. In his opinion, the victim died between one and two hours after the wounds were inflicted. During his examination of the body, Dr. Francisco also discovered a tear of the vagina, a wound he described as caused by forcible penetration. Fluid samples from the victim's vaginal area "[r]evealed the presence of sperm and enzymes that are present in seminal fluid." It was Dr. Francisco's opinion that the vaginal injuries were likely the product of forcible rape.

The proof also established that the Defendant had been convicted of murder in Rankin County, Mississippi in 1998, seven years after the victim's murder. The 1998 conviction was for a murder that had occurred some twenty years earlier. The Defendant was sentenced to a term of life. At the request of defense counsel, the judgment of conviction was admitted as an exhibit so that the jury would understand that there was "a detainer in Mississippi waiting on [the Defendant] no matter what happens in this case."[3]

The defense counsel, in an effort to persuade the jury to spare the Defendant's life, called Glori Shettles, an investigator who was qualified as an expert in the field of mitigation, and several other witnesses to testify. Because Ms. Shettles had previously worked for the Tennessee Board of Probation and Parole, she also qualified as an expert in parole procedure and policies. She testified that her background study indicated that the Defendant, who had one older and one younger sister, was born in 1960 to Norman and Nellie Smith, who were twenty and seventeen years old respectively. Ms. Shettles described his home life as "unstable" and testified that his mother abandoned the family before the Defendant was two-

---

[3] When a juror asked if a prior conviction could be considered an aggravating factor, the trial court explained that "I cannot discuss with you whether you should find it to be an aggravating circumstance," but confirmed that the State was seeking to prove two aggravating circumstances, one of which was a prior felony conviction involving the use of violence to the person.

and-a-half years old. The Defendant never saw his birth mother again.[4] After the Defendant and his sisters were sometimes left at a daycare center "for days," the State intervened and the Defendant and his two sisters were adopted by members of the Odom family. The Defendant was adopted by Jimmy and Shirley Odom, who had three biological children at the time: Cindy, Jimmy Jr., and Larry, ranging in ages from two to seven. When the Defendant, at age three, joined the Odom family, he had cigarette burns on his body. Burns on his feet were so severe that he was unable to wear socks and shoes. About a year after adopting the Defendant, the Odoms divorced, and his adoptive mother married Marvin Bruce, who allegedly mistreated the Defendant and his brother Larry.[5] According to Ms. Shettles, Bruce used "excessive discipline" on both boys and ridiculed the Defendant for wetting the bed by hanging his sheets and clothes outside for others to see. Ms. Shettles also learned that when the Defendant and Larry were bathing, Bruce would "would scrub them excessively . . . would pull and tug on their penis [and] call them names and make fun of them." Her investigation indicated the Defendant had also endured cruelty at the hands of Shirley Odom's mother, who never accepted the Defendant as part of the family and treated him differently from her biological grandchildren; no one Ms. Shettles interviewed "[had] the impression that [Shirley Odom's mother] cared anything for" the Defendant.

The Defendant, when an adolescent, ran away from the Bruce home and subsequently was ordered into the Mississippi juvenile court system. A psychological evaluation performed for the authorities there when the Defendant was fourteen years old indicated that he suffered from impaired insight, memory, and reasoning. He was diagnosed as having a moderate to severe personality disturbance. The evaluator determined that the Defendant only read at "a beginning second grade level" and "strongly urge[d that he not be] place[d] . . . in any academic situation." It was recommended that he enter a "complete evaluation program" in order to avoid psychosis or mental deterioration to the point of institutionalization.

Thereafter, the Defendant was placed in a Caritas program, but was found unfit to participate after thirty days. After his release in 1975, the Defendant was returned to the juvenile authorities. He escaped to be with his birth father, who lived one hundred and thirty miles away. Afterward, he voluntarily returned and was placed at the Columbia Training

---

[4] Although the Defendant's birth father was still alive at the time of trial, he declined to attend the trial because of poor health. The Defendant's birth mother declined Ms. Shettles' requests for an interview, but had previously acknowledged to others that she "wasn't mother material."

[5] At the time of the sentencing hearing, Larry Odom was serving a seventy-five month sentence in the Oregon State Penitentiary for a 2001 sexual battery conviction.

Center.[6]  According to Ms. Shettles, the Defendant tried to run away from Columbia several times.  Because on one occasion the Defendant was treated for "a severe contusion of the right eye and jaw," Ms. Shettles speculated that he had been beaten while institutionalized there.  During this period, a psychologist, who predicted that the Defendant would be incarcerated his whole life, described him as "brain damaged, incorrigible, antisocial, unable to respond to usual social contingency program [sic] and a loser with respect to probable adult adjustments."  The psychologist also believed that the Defendant was "untreatable, unmanageable and a liability to society for the rest of his natural life," commenting that "if this youngster changes for the better, it will be an act of God."  When the Defendant was fifteen, he was conditionally released and, for a time, helped care for his uncle, who had lost his legs to gangrene.

Ms. Shettles then addressed the Defendant's record at Riverbend Maximum Security Prison, where he had been incarcerated since 1992.  During the period since the victim's murder, he had obtained his GED and a paralegal certification.  He worked as a teacher's aide, participated in life skills and Bible study classes, and also engaged in various arts and crafts.  He was described by a correctional officer as a hard worker, having a positive attitude, being helpful, and treating other inmates and staff with courtesy.  The Defendant's only infraction was in 1996, when he threw a mop bucket towards a guard, who, while standing behind a glass barrier, had allegedly taunted him.  Ms. Shettles remarked that one write-up during this period of time was an "extremely low number."  She also commented that the Defendant's prison record was "very positive," rating "in the top three."

In her capacity as an expert on parole procedures, Ms. Shettles described the Defendant's chances for release on a life sentence as "close to impossible."  She made specific reference to the Defendant's other murder conviction in Mississippi, his escape from jail just prior to the murder of the victim, and prior theft and robbery convictions.[7]  She also testified that even if the Defendant received parole in Tennessee, he would be returned to Mississippi to serve the remainder of the life sentence there.

---

[6] Ms. Shettles testified that in 1977, a class action lawsuit was filed "on behalf of the people that had been housed at Columbia Training Center," see Morgan v. Sproat, 432 F. Supp. 1130 (S.D. Miss. 1977), which involved allegations of constitutional violations based on the treatment of the youth who resided there.  She also testified that in 2002, the United States Attorney General conducted an investigation regarding alleged civil rights violations, including "unconstitutionally abusive disciplinary practices such as hogtying, pole shackling, improper use and over use of restraints and isolation, [and] staff assaulting youths."

[7] The trial court instructed the jury that the escape was not to be used as an aggravating circumstance, and that the evidence could only be considered, if at all, "to rebut any mitigating circumstances about his behavior in prison."  The trial court also gave curative instructions, explaining to the jury that the robbery was not a crime of violence and had no bearing on the aggravating circumstance relied upon by the State.

After reviewing the exhibits pertaining to mitigation, the jury submitted a series of written questions, including whether "mandatory parole" and "parole" could be "define[d] in layman's terms." Afterward, defense counsel recalled Ms. Shettles, who testified that if the Defendant was given a life sentence in this case, he would not be eligible for mandatory parole. She also explained that if sentenced to life imprisonment, the Defendant would be eligible for discretionary parole after twenty-five years, but that his prior murder conviction and his escape from prison in Mississippi made parole highly unlikely.[8]

Tim Terry, an inmate records manager at Riverbend, confirmed that if the Defendant ever received parole in Tennessee, he would be returned to Mississippi to serve his life sentence there. He provided assurances that, in the event the Defendant received a life sentence for the victim's murder, he would not be moved from Riverbend to a local county jail.

Dr. Joseph Angelillo, a clinical psychologist who qualified as an expert in forensic psychology, evaluated the Defendant and reviewed his social history. While admitting that he was unable to make a specific diagnosis, Dr. Angelillo found indications of "schizoid personality features," marked by a tendency to do things alone, sub-par social skills, lack of joy, withdrawal from others, and a fear of relationships "unless [there is] absolute assurance that they're going to be accepted." In his opinion, the lack of sufficient mental health treatment afforded the Defendant as a child, the rejection he had experienced, and the physical and sexual abuse he had undergone all had a profound effect on his development. Dr. Angelillo testified that the Defendant's time in the structured environment of Riverbend had "behaviorally defined . . . his ability . . . to engage in constructive activities." He believed that the Defendant would continue to thrive in this structured environment if given a life sentence.

Dorothy Rowell, the Defendant's adoptive aunt, also testified on his behalf, describing him as a "part of our family." She stated that her mother had adopted one of the Defendant's sisters, and that the other had been adopted by Ms. Rowell's sister. Ms. Rowell, who had spent a substantial amount of time with the children prior to the Odoms' divorce, described the Defendant as "[v]ery sweet," "[v]ery loving," "[a]lways smiling," "[h]appy, and a [v]ery precious little boy." She stated, however, that after the divorce of his adoptive parents "[h]e wasn't the happy smiling little boy that I remembered." She testified that the Defendant, when a teenager, "was very, very good" with her invalid brother, Charles, and "[t]reated him like a baby."

_____

[8] The trial court properly instructed the jury that it could not consider parole as an aggravating factor, and that any proof presented that the Defendant might get parole could only be used to rebut the mitigating circumstances.

Cindy Martin, the Defendant's adoptive sister, described the Defendant as "[t]he sweetest person you would ever want to meet" prior to the time Marvin Bruce, his stepfather, became a part of his life. She described Bruce as "horrible" and a "terrible person" who mistreated the Defendant. She stated that after Bruce's arrival, the children stayed with their grandmother more often, and while Ms. Martin enjoyed being there because her grandmother generally "spoil[ed] kids," their grandmother "never really accepted [the Defendant] as her grandchild" and "would hit him with anything she could find."

Jimmy Odom, Jr., the Defendant's older adoptive brother, testified that prior to the Odoms' divorce, the Defendant was treated well, and that they were "kind of like a family then." He also claimed that things changed after his mother remarried, and that the Defendant "wasn't treated like a child" and "never was loved." He described their grandmother as "a mean woman" who often struck the Defendant "with belts and stuff like that," and who never accepted the Defendant into the family. He called Marvin Bruce "a pervert – [j]ust a sorry person." He stated that if the Defendant ever tried to reach for food at the dinner table before someone else, his stepfather "would pop him up beside his head, . . . and just make him wait." Although he never witnessed Bruce sexually abusing the Defendant, Jimmy, Jr. stated that he had "no doubt" that he had physically abused him. He testified that there was "no love in our family" and that, as a result, the Defendant "never had a chance."

Like the Defendant, Jimmy, Jr. was housed at Columbia Training School for a time. He stated that on each day of their detention, the residents spent forty-five minutes reading and forty-five minutes on mathematics, but that the rest of the day was spent "in the fields." He testified to the excessive forms of discipline at the school, asserting that "[t]hey would whup you with a board" and that "if you couldn't take the licks they would get other people to hold you down." He also stated that when residents ran away, they would receive a beating from the staff. Jimmy, Jr., who was an inmate at Parchman Prison at the same time as the Defendant and their brother Larry, described it as "a real bad prison," where juvenile inmates are not housed separately. He stated that both Larry and the Defendant were sexually abused by the older inmates there and that his efforts to take up for his younger brothers often resulted in fights at the prison.

Several others who had become acquainted with the Defendant during his time in prison also testified on his behalf. Celeste Wray, who had been involved in prison ministries for eighteen years, corresponded with the Defendant on a regular basis and developed a friendship with the Defendant. She stated that her letters from the Defendant had "been pleasurable and enjoyable" and that they were "always very respectfu[l], which I appreciated." Ricky Harville, who was an instructor at Riverbend, testified that the Defendant worked as his aide when he began teaching at the prison in 2003. He recalled that

the Defendant assisted the other inmates with reading and writing and that his interaction with them was "very positive." He stated that the Defendant was "very helpful," that he approached his job in a very positive manner, and that he served as a role model for other inmates who sought educational opportunities. In his opinion, the Defendant would continue to impact other inmates in a positive way if he received a life sentence. Gordon Janaway, a former teacher in various correctional institutes, taught the Defendant in a GED class at Riverbend. He testified that after the Defendant obtained his certificate, he became a clerk in the classroom. Janaway stated that the other inmates "really respected him because he had earned a GED . . . which is not easy to do in corrections." Jim Boyd, who taught a life skills course at Riverbend, met the Defendant while conducting a class. Boyd testified that the Defendant was "an active participant" in the class and observed that the Defendant had changed "for the better" during his time in prison. Finally, Helen Cox, who was also involved in the life skills course, testified that she kept a photo of the Defendant on her desk that was taken the day he received his GED. She described the Defendant as a part of her extended family.

At the conclusion of its deliberations, the jury imposed a sentence of death for the count of first degree murder, concluding that two statutory aggravating factors, that the Defendant had been previously convicted of a felony involving the use of violence to the person and that the murder was committed while the Defendant was engaged in the commission of a robbery, had been established beyond a reasonable doubt, see Tenn. Code Ann. § 39-13-204(i)(2), (7) (Supp. 1990), and further determining that the aggravating circumstances outweighed the evidence of the mitigating circumstances beyond a reasonable doubt. See Tenn. Code Ann. § 39-13-204(g).

On appeal, the Court of Criminal Appeals held that the death sentence was not imposed in an arbitrary manner and that the evidence supported the jury's findings as to the aggravating and mitigating circumstances. See State v. Odom, No. W2008-02464-CCA-R3-DD, 2010 Tenn. Crim. App. LEXIS 223, at *107 (Tenn. Crim. App. Mar. 4, 2010). That court also determined that the sentence was not excessive and was proportional in comparison to similar cases in which a death sentence has been imposed. Id. Because the death sentence was affirmed, the appeal was automatically docketed in this Court. See Tenn. Code Ann. § 39-13-206(a)(1) (2010).

The following issues have been presented for our review: (1) whether the Defendant's state and federal constitutional rights to a fair and impartial jury were violated by the disqualification of a prospective juror; (2) whether the prosecutor's argument for the jury to weigh non-statutory aggravating factors warrants reversal of the death sentence; (3) whether the admission of photographs of the body constituted error; (4) whether the trial court instructions on parole and prosecutorial misconduct violated the Defendant's right to due

process of law and heightened reliability; (5) whether the mandatory criteria of Tennessee Code Annotated section 39-13-206(c)(1) were satisfied; and (6) whether a judge on the Court of Criminal Appeals, who had reduced the amount of compensation sought by appellate defense counsel, should have been disqualified from participating in the case.

## Analysis
### 1.  Dismissal of Prospective Juror for Cause

The Defendant argues that his right to an impartial jury under the Sixth, Eighth and Fourteenth Amendments to the federal Constitution and article I, sections 8, 9, and 16 of the Tennessee Constitution was violated when the trial court excluded a prospective juror based on her beliefs about the death penalty.  While acknowledging inconsistencies in the juror's statements as to whether she could vote to impose the death penalty, the Defendant maintains that because the trial judge never asked the juror directly if she would refuse to sign the verdict form, her exclusion constituted reversible error.  In response, the State argues that the juror "equivocated only when pressed about whether she would follow the law if she took an oath to do so," but "repeatedly told the trial court that she was not sure she would be able to sign a verdict of death," which warranted her dismissal.[9]

Both the United States Constitution and the Tennessee Constitution guarantee a criminal defendant the right to trial by an impartial jury.  See U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."); Tenn. Const. art. I, § 9 ("[I]n all criminal prosecutions, the accused hath the right to . . . a speedy public trial, by an impartial jury of the county in which the crime shall have been committed . . . ."); see also Uttecht v. Brown, 551 U.S. 1, 9 (2007) ("[A] criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause.").  A prospective juror may, however, be properly excused for cause when his or her views on capital punishment

---

[9] The State also asserts that the Defendant is limited to a plain error review of this issue because he did not present this issue in his motion for new trial.  We apply a five-element plain error analysis when reviewing errors that are not raised by a defendant in a motion for new trial.  Tenn. R. App. P. 36(b); Grindstaff v. State, 297 S.W.3d 208, 219 n.12 (Tenn. 2009).  We have applied the plain error analysis in numerous capital cases.  See, e.g., State v. Jordan, 325 S.W.3d 1, 57-58 (Tenn. 2010); State v. Hester, 324 S.W.3d 1, 56-57 (Tenn. 2010); State v. Reid, 213 S.W.3d 792, 834 (Tenn. 2006) (appendix); State v. Caldwell, 671 S.W.2d 459, 465-66 (Tenn. 1984).  Tennessee Code Annotated section 39-13-206(b) states that a court reviewing a capital case "shall first consider any errors assigned and then . . . shall review the sentence of death."  (Emphasis added.).  Relying on this statute, we also have reviewed errors assigned on appeal without using the plain error analysis despite the defendant's failure to either object at trial or include the ground in a motion for new trial.  See, e.g., State v. Nesbit, 978 S.W.2d 872, 880-81 (Tenn. 1998).  Our conclusion as to the Defendant's assigned errors in this case would be the same using either approach.

"would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424 (1985) (internal quotation marks omitted); see also State v. Thomas, 158 S.W.3d 361, 378 (Tenn. 2005). While "a juror's bias need not be proven with 'unmistakable clarity' to justify a challenge for cause," the trial court "must have the 'definite impression that a prospective juror could not follow the law.'" Thomas, 158 S.W.3d at 378 (quoting State v. Hutchison, 898 S.W.2d 161, 167 (Tenn. 1994)). In determining whether a potential juror may properly be removed for cause, "the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts." Uttecht, 551 U.S. at 9. As a result, "[a] trial court's findings 'are accorded a presumption of correctness, and the [defendant] must establish by convincing evidence that the trial court's determination was erroneous before an appellate court will overturn that decision.'" Thomas, 158 S.W.3d at 378 (quoting State v. Austin, 87 S.W.3d 447, 473 (Tenn. 2002)). Because the right to an impartial jury is a fundamental aspect of a fair trial, the infraction of this right "'can never be treated as harmless error.'" Gray v. Mississippi, 481 U.S. 648, 668 (1987) (quoting Chapman v. California, 386 U.S. 18, 23 (1967)); see also State v. Bobo, 814 S.W.2d 353, 358 (Tenn. 1991).

During voir dire, the prosecution asked a prospective juror about her answers to the juror questionnaire. Pertinent portions of the colloquy are as follows:

> [The State]: [Y]ou mentioned in your questionnaire that you could not consider both forms of punishment in a case like this. Is that right?
>
> The Juror: Yes.
>
>     . . . .
>
> [The State]: And you indicated that you would not be open to both sentences in a . . . murder first degree case.
>
> The Juror: Yes.
>
> [The State]: [I]s the basis of your feeling . . . religious or personal or ethical or all of the above . . . ?
>
> The Juror: Well, I feel it because – me, myself, as a person, I don't really have a right to judge somebody for what they've done. I wasn't there when it happened. I'm not saying that it didn't happen or I just – I feel strongly about that.

. . . .

[The State]:  Can you think of any circumstance under which . . . you could vote for the death penalty and sign your name as one of the people . . . imposing a death penalty on an individual.

The Juror: No.

. . . .

[The State]: [E]ven if I could describe for you just the most horrible . . . case . . . is it that your feeling against the death penalty is so strong . . . that you could never consider imposing it in a criminal case?

The Juror: Well, . . . when it comes to . . . innocent little children, then I am for it.

. . . .

[The State]:  Now, are you telling me that there are some circumstances where you could be open to the possibility of the death penalty, and perhaps sign your name as a person saying this person should have the death penalty[?]

The Juror: Right.  Like I said, it all depends on . . . the situation.

. . . .

[The State]: [D]o you think that you would then have a right to make that judgment in a case where it was children but maybe you wouldn't have a right to make [it] where it was adults that were killed?

The Juror: I guess, children are like – I'm not saying that this adult wasn't innocent or anything, but children are more innocent, to me.  That's just how I feel about it . . . .

. . . .

[The State]: That is, if the State proves for you one or more of those aggravating circumstances and you weigh it and find that it outweighs any

-13-

mitigation . . . beyond a reasonable doubt, could you vote and sign your name as one of those people to, you know, vote for the death penalty?

The Juror: No, I can't. No.

　　　. . . .

[The State]: [T]hat's why we're having this conversation because both sides in this case are entitled to people who could follow the law, such as it is, and now is the time for us to talk about it . . . And I guess the only thing I know to do is to ask you . . . [i]f it was a horrible, horrible case against a child could you perhaps sign your name and say this is, perhaps, a death penalty case?

The Juror: Well, no, I really can't. I can't.

Defense counsel then questioned the juror as follows:

[Defense Counsel]: I think you're like lots of people, in some cases, you would say, well, I just can't see the death penalty being appropriate in that case. But if . . . it does involve a child or the rape of a child or torture of a person then maybe you would consider it. Is that kind of where you're coming from on this?

The Juror: Yeah.

　　　. . . .

[Defense Counsel]: Could you . . . sit and consider whether the State has brought enough proof beyond a reasonable doubt before you would ever look or consider the death penalty?

The Juror: No . . . . What I mean, I couldn't consider the death penalty for him if they . . . hadn't brought enough evidence.

　　　. . . .

[Defense Counsel]: So if you were instructed, if they don't . . . prove it to you beyond a reasonable doubt, then don't consider the death penalty. If that's what you're instructed, you can follow that law, can't you?

-14-

The Juror: Yes.

[Defense Counsel]: The way that the balancing works is . . . you would only be asked to consider the death penalty if you had first seen enough proof to say that the aggravating circumstance is proven beyond a reasonable doubt, and then enough proof to say that the aggravating circumstance outweighs the mitigating circumstances beyond a reasonable doubt. . . . Can you do that?

The Juror: I just don't like judging, I just, no . . . .

[Defense Counsel]: Okay. You don't like judging other people. . . . but if you were called upon to follow that duty by the law, can you do that?

The Juror: I would have to. I have no choice.

[Defense Counsel]: All right. And before you could consider [the] death penalty, would you hold the State to their burden and make them bring enough proof to prove an aggravating circumstance to you beyond a reasonable doubt?

The Juror: If I have to, yes. If I have to I will.

    . . . .

The trial judge then asked the juror whether, if given an oath and sufficient proof as mandated by the controlling law, she could vote for a death sentence. When the trial judge observed, "[y]ou're shaking your head no, but I'm not sure," the juror responded, "[i]f they brought enough evidence, I wouldn't have no choice." The following exchange then took place:

The Court: [I]f you are a juror in this case, and I gave you that oath, and you swore to follow it, the question is, could you sign a verdict of death in a proper case, if the State proved aggravating circumstances beyond a reasonable doubt. And you're the only person that can tell me that.

The Juror: I just – I can't . . . .

When the trial court commented for the record that the juror was shaking her head, she responded, "I just don't feel right signing somebody's death." At that point, the trial court excused the juror for cause, explaining as follows:

She said that she would have to follow the law . . . And obviously she would if she took the oath. But the problem is I'm not going to give her the oath if she tells me that she can't sign a death verdict. I find from what she said and her shaking her head no and everything else that her views whether right or wrong would substantially impair her function as a juror.

The Defendant, who timely objected to the ruling, contends that the trial judge's failure to explicitly ask the juror if she would "refuse to sign the verdict form" means that "there is no evidentiary support for the trial court's ruling." We disagree. Initially, the trial court asked the juror if she could "sign a verdict of death in a proper case," to which she responded "I just don't feel right signing somebody's death." In order to justify exclusion for cause, trial courts need only determine that a prospective juror's views on the death penalty "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Witt, 469 U.S. at 424 (internal quotation marks omitted).

While the juror at issue was equivocal in some of her responses in the voir dire, she also expressed an unwillingness "to judge somebody for what they've done" when she "wasn't there when it happened." Under similar circumstances, in State v. Duncan, 698 S.W.2d 63, 71 (Tenn. 1985), this Court found exclusion proper where the juror stated that "she did not 'believe' she could consider the death penalty as an alternative punishment unless she saw the crime committed" and that "she just did not 'want to be put in a position to judge another human being on the basis of what one says against what another person says.'" A fair interpretation of the juror's comments here is that she could have approved the death penalty only in the murder of a child victim. Because this prosecution involved an adult victim, the juror's personal reservations, in our view, could have "prevent[ed] or substantially impair[ed] the performance of h[er] duties." Witt, 469 U.S. at 424. More importantly, the trial judge personally observed the juror's physical responses to the questions presented. An assessment of the juror's ability to adhere to her oath made by the trial court, based upon not only the answers to questions posed by counsel but also non-verbal responses, is owed deference. See Uttecht, 551 U.S. at 9. In short, the record does not convincingly establish that the juror at issue would have been able to follow the requirements of law. The trial court, therefore, did not err in dismissing the juror.

## 2. Prosecutorial Misconduct in Urging the Jury to Weigh Non-Statutory Aggravating Factors

The Defendant contends that during closing arguments, the prosecution improperly argued non-statutory aggravating factors by making reference to the fear the victim experienced during the assault, the photographs of her body, and the Defendant's prior criminal convictions. The Defendant asserts that because Tennessee is a "weighing" state,

these non-statutory aggravating factors "skew[ed] the . . . process" in violation of article I, sections 8, 11, and 16 of the Tennessee Constitution, the Ex Post Facto Clause and the Eighth and Fourteenth Amendments of the United States Constitution, and Tennessee Code Annotated section 39-13-204. In response, the State submits that the prosecutor's argument "directly related to both the permissible evidence contemplated by Tenn. Code Ann. § 39-13-204 and to the aggravating circumstances and mitigating evidence in the case." In the alternative, the State argues that "the adverse effect, if any, of the prosecutor's closing argument was 'erased' by the trial court's proper instructions to the jury as to weighing the aggravating and mitigating circumstances."

It is well-established that the State may not rely upon non-statutory aggravating circumstances when it seeks the imposition of the death penalty. See Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001); see also Nesbit, 978 S.W.2d at 890 ("[T]he State may not rely upon non[-]statutory aggravating circumstances to support imposition of the death penalty, but is limited to those aggravating circumstances listed in the statute."). While closing arguments must be, among other things, based upon the evidence presented at trial and "pertinent to the issues," Jordan, 325 S.W.3d at 64, the arguments are considered "a valuable privilege that should not be unduly restricted." State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978). As a result, our courts have traditionally "give[n] wide latitude to counsel in arguing their position in a case to the jury." Id.; see also Terry, 46 S.W.3d at 156. Because a trial court has broad discretion in controlling these arguments, a decision to allow an attorney to argue a particular point to a jury will only be reversed upon a showing of an abuse of discretion. Sutton, 562 S.W.2d at 823. "Generally, an abuse of discretionary authority occurs only when the trial court applies an incorrect legal standard or reaches a decision which is against logic and reason." Frazier v. State, 303 S.W.3d 674, 679 (Tenn. 2010).

This broad latitude afforded attorneys during closing arguments must also be viewed in light of our capital sentencing scheme. In determining whether death is the appropriate punishment for a particular defendant, a jury may consider "the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances . . . and any evidence tending to establish or rebut any mitigating factors." Tenn. Code Ann. § 39-13-204(c) (Supp. 1990); see also State v. Harris, 919 S.W.2d 323, 331 (Tenn. 1996) ("[B]oth the State and the defendant may introduce any evidence relating to the circumstances of the crime, relevant aggravating circumstances or any mitigating circumstances, so that the jury will have complete information relevant to punishment."). We have construed the statute to permit the sentencing jury "to consider 'a myriad of factors' relevant to . . . establishing and assigning

-17-

weight to aggravating and mitigating circumstances."[10] Terry, 46 S.W.3d at 156-57; Nesbit, 978 S.W.2d at 890 ("[O]nce a capital sentencing jury finds that a defendant falls within the legislatively defined category of persons eligible for the death penalty, the jury is free to consider a myriad of factors to determine whether death is the appropriate punishment to the offense and the individual defendant."); State v. Nichols, 877 S.W.2d 722, 731 (Tenn. 1994); see also Ramos, 463 U.S. at 1008. Accordingly, counsel may address during closing argument any of the evidence admissible pursuant to the statute.

In this instance, the prosecutor surmised that, upon the victim's encounter with the Defendant, "[she] must have been scared to death," and that "[s]he probably got a little nervous, all one hundred and five pounds of her when he barged into the front seat of her car with his knife and demanded money." She further speculated that the unsuspecting victim had no idea that "[the Defendant] killed before . . . [and] had walked away from jail." The prosecutor then referred to one of the photographs admitted into evidence, pointing out that the victim is shown "clutching the check. . . . [i]n her frail little dead hand . . . [b]ecause he demanded money." She hypothesized that because of his escape status, he could not "go apply for a job," so he was "lurking around in the parking garage trying to find" a vulnerable victim. The prosecutor argued that, in an effort to mollify the Defendant, the victim might have displayed her checkbook and "[s]aid, here, what do you want?" She then described the

_____

[10] The Defendant argues that a jury's consideration of a "myriad of factors" in making a sentencing determination is only proper in a "non-weighing" state, as opposed to a "weighing" state, because "in a non-weighing [s]tate there is no 'scale' and the jury is not required to weigh aggravation against mitigation in order to arrive at punishment." In Barclay v. Florida, 463 U.S. 939, 948-49 (1983), however, the United States Supreme Court determined that in Florida, a weighing state, the jury's consideration of non-statutory information relevant to an aggravating factor was a constitutionally permissible way of determining the weight to be given a particular aggravating factor. The Court concluded that "'[o]nce the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment.'" Id. at 950 (quoting California v. Ramos, 463 U.S. 992, 1008 (1983)); cf. id. at 967 (Stevens, J., concurring) ("[T]he Constitution does not prohibit consideration at the sentencing phase of information not directly related to either statutory aggravating or statutory mitigating factors, as long as that information is relevant to the character of the defendant or the circumstances of the crime."). Furthermore, the Terry decision established that the "myriad of factors" that may be considered by the jury are guided by statute, which allows evidence of "the nature and circumstances of the crime; the defendant's character, background history, and physical evidence; any evidence tending to establish or rebut the aggravating circumstances; and any evidence tending to establish or rebut any mitigating factors." 46 S.W.3d at 156-57 (internal quotations omitted). This evidence, in turn, must first be reviewed by the trial court to ensure its probative value. See, e.g., State v. Sims, 45 S.W.3d 1, 14 (Tenn. 2001) ("Our constitutional standards require inquiry into the reliability, relevance, value, and prejudicial effect of sentencing evidence to preserve fundamental fairness and protect the rights of both the defendant and the victim's family."). These safeguards adequately guide the jury's discretion and guard against the arbitrary imposition of the death penalty based upon irrelevant evidence. See Barclay, 463 U.S. at 950-51.

struggle that ensued, submitting that the jury should "know . . . from the pictures" that the struggle began in the front seat of the car before the Defendant pushed the frail victim into the back seat, first raping her, and then stabbing her again. The prosecutor asked the jury to consider that the Defendant had taken advantage of the trust of "all those suckers in Parchman [Prison]" in order to complete his escape. Further, the prosecutor specifically argued the applicability of the two aggravating factors, pointing out that the jury had the prerogative to weigh the circumstances "as you wish," and was critical of portions of the testimony for the defense, suggesting that the social history failed to include the Defendant's crimes and prison record between 1974 and 1992. In reference to the mitigating circumstances involving the Defendant's upbringing, the prosecutor simply stated that the jury could assess the weight and credibility to be given the proof, and that they did not "have to take [the testimony] at face value."

In response to this opening argument by the State, defense counsel stressed that the two aggravating factors were the only ones that could be considered by the jury during the weighing process. Defense counsel also addressed, at length, the State's use of the photographs and how they were being used to "inflame you," making it "so hard to limit yourself to just those aggravators." Defense counsel asserted that the State introduced the pictures "[b]ecause they don't want you to use the law. They want you to use passion and anger."

In rebuttal, the State again addressed the weighing of the two aggravating circumstances against the mitigating circumstances, arguing that the process involved an evaluation of "quality as opposed to quantity." This, the prosecutor claimed, was "why [the State] put up pictures of [the victim]. . . . to try to give you a little bit of [an] idea of what her last minutes on this planet were like. They don't support or prove an aggravator, but they're to assist you in your weighing decision."

Our analysis in Terry is instructive as to the propriety of the State's closing arguments. In Terry, the defendant argued that the State erred "when it asked the jury to 'consider in the balance,' 'weigh . . . in the balance,' and 'put in the balance' six 'unique circumstances' against the mitigating proof." 46 S.W.3d at 156. These six circumstances - "extreme premeditation," "innocent victim," "brutality of murder," "violated private trust," "burning a church," and "concealment of crime" - had been displayed on a chart to contrast the mitigating factors claimed by the defense. Id. This Court held that the use of the "unique circumstances" was not improper because (1) they were "within the realm of permissible evidence contemplated by" the statute governing capital sentencing and (2) the closing argument as a whole showed that the prosecutor used the "unique circumstances" to support and give weight to the aggravating circumstances. Id. at 157. The Court found no error with the argument, holding that the prosecutor had "first, properly identified the two aggravating

circumstances to be proven, and second, offered six factors to establish or give weight to these aggravating circumstances." Id. at 158. Further, this Court ruled that even if the prosecutor's closing argument approached the point of impermissibility, any error was cured by the trial court's instructions, which required the jury to consider only the aggravating circumstances proven by the State in determining the appropriate sentence and which informed the jury of the weighing process. Id.

The Terry rationale is persuasive, and after reviewing the content of the record, our view is that the State's argument did not result in the erroneous injection of non-statutory aggravating factors into the weighing process. The prosecutor clearly relied upon only two aggravating circumstances and, during argument, attempted to provide context to both the aggravating and mitigating circumstances. See Terry, 46 S.W.3d at 158; accord State v. Cunningham, 824 N.E.2d 504, 524 (Ohio 2004) ("Prosecutors are entitled to urge the merits of their cause and legitimately argue that defense mitigation evidence is worthy of little or no weight.").

Further, the prosecutor's references to the victim's slight weight, the fear she must have felt, and the content of the photographs of the body related to the "nature and circumstances" of the crime. That the victim had a check in her hand at the time of her death was further evidence that the murder was committed in the perpetration of robbery. As previously indicated, this evidence is explicitly permitted by the statute. See Tenn. Code Ann. § 39-13-204(c). Finally, the Defendant's escape from Simpson County Jail and his theft and robbery convictions were used to rebut his claim of good behavior during his incarceration as a mitigating circumstance. See State v. Bane, 57 S.W.3d 411, 424 (Tenn. 2001) ("[T]he prosecution is permitted to rebut any mitigating factors relied on by a defendant."); accord State v. Schmeiderer, 319 S.W.3d 607, 621 (Tenn. 2010).

In summary, the Defendant is not entitled to relief on this issue. Moreover, even if the argument on behalf of the State at any point crossed the line of impermissibility, here, as in Terry, the trial court properly instructed the jury as to the weighing of the aggravating and mitigating circumstances; it must be presumed that a jury has followed the instructions given by the court. 46 S.W.3d at 158.

### 3. Admission of Photographs

The Defendant contends that the trial court erred by admitting into evidence two photographs, Exhibits 5 and 6, each of which depicted the body of the victim, because they were "cumulative, irrelevant to the issues in the re-sentencing hearing, and prejudicial." In support of this argument, the Defendant initially asserts that the rationale for upholding the admission of the photos – that they were relevant to show the nature and circumstances of the crime – "conflicts with the rule in State v. Teague, 897 S.W.2d 248, 251 (Tenn. 1995),

that evidence about the circumstances of the crime [must] be 'carefully limit[ed] . . . to essential background.'" Moreover, the Defendant questions the admissibility of the photographs by the application of the guidelines set out in State v. Banks, 564 S.W.2d 947 (Tenn. 1978). In response, the State asserts that the trial court properly applied the "law of the case" doctrine by allowing the photographs to be seen by the jury as "relevant to the circumstances of the offense."

## A. "Law of the Case" Doctrine

In Odom II, this Court upheld the admission of the two photographs at issue as relevant evidence, illustrative of the "nature and circumstances" of the crime. 137 S.W.3d at 588. More specifically, this Court observed as follows:

> The first photograph, which was three-by-five inches in size, showed the victim in the back seat floorboard of her car and the multiple stab wounds and bleeding she suffered. The second photograph, which was also three-by-five inches in size, showed the victim on the floorboard with her head facing the rear of the car and a rolled up check in her hand. In sum, the photographs were relevant for the prosecution to show the "nature and circumstances" of the crime, i.e., the position of the victim's body, the location of the offense, the defendant's actions, and the injuries suffered by the victim.

Id. We also determined that the photographs were not unfairly prejudicial. Id.

During the sentencing hearing, the trial court took particular note of this Court's resolution of the photograph issue in Odom II, concluding that the ruling had become the "law of the case." The trial court, which had excluded several photographs offered by the State as overly prejudicial, also made its own assessment, however, holding that the photographs at issue were admissible, as they were not particularly incendiary, even though the victim was depicted in a "pitiful" state. Because "the State has a right to prove the nature of the offense" and the jury had "a right to know about the murder itself," the trial court permitted the two photographs as exhibits. While the defense offered to stipulate a verbal description of the photographs' content, the trial court observed that "you can't stipulate to the circumstances [of the crime]." The Court of Criminal Appeals agreed, holding that the photographs properly illustrated "the position of the victim's body where the homicide occurred and help[ed] explain the circumstances surrounding the offense." Odom, 2010 Tenn. Crim. App. LEXIS 223, at *55.

"[U]nder the law of the case doctrine, an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal." Memphis Publ'g Co. v.

Tenn. Petroleum Underground Storage Tank Bd., 975 S.W.2d 303, 306 (Tenn. 1998). This doctrine "applies to issues that were actually before the appellate court in the first appeal and to issues that were necessarily decided by implication," but it is inapplicable to dicta. Id. (citation omitted). The doctrine "is not a constitutional mandate nor a limitation on the power of a court," but "is a longstanding discretionary rule of judicial practice which is based on the common sense recognition that issues previously litigated and decided by a court of competent jurisdiction ordinarily need not be revisited." Id. (citations omitted). Application of the doctrine promotes finality, efficiency, consistent results, and obedience to appellate decisions. Id.

There are three "limited circumstances" that may justify a departure from the law of the case doctrine and subsequent reconsideration of an issue decided in a previous appeal:

> (1) the evidence offered at a trial or hearing after remand was substantially different from the evidence in the initial proceeding; (2) the prior ruling was clearly erroneous and would result in a manifest injustice if allowed to stand; or (3) the prior decision is contrary to a change in the controlling law which has occurred between the first and second appeal.

Id. at 306. While neither the first nor second ground for a departure from the law of the case doctrine is present, the Defendant argues that the admission of the photographs "would seem to be in conflict with the rule in State v. Teague." The Teague opinion, however, was filed prior to our decision in Odom II; therefore, the controlling law did not change between the first and second appeal. Id. at 306. In consequence, the trial court properly applied the law of the case doctrine in these circumstances.

## B. Nature and Circumstances of the Crime

The Defendant also argues that the photographs did not provide "essential background" for purposes of showing the "nature and circumstances" of the crime and, therefore, this Court's ruling in Odom II that the photographs were relevant for these purposes, see 137 S.W.3d at 588, is in direct conflict with the ruling in Teague, 897 S.W.2d at 248. Because the re-sentencing jury did not have the benefit of the proof introduced at the guilt phase, the State contends that its familiarity with the circumstances of the crime was "essential to ensure both individualized sentencing by the jury and effective comparative proportionality review by the appellate courts." The Court of Criminal Appeals declined to address the Defendant's argument, stating that "[a]s an intermediate appellate court, we are bound by the decisions of our supreme court and without authority to consider whether these decisions are in conflict." Odom, 2010 Tenn. Crim. App. LEXIS 223, at *52.

Our resolution of this issue requires both a review of the standard by which evidence is admitted during a capital sentencing hearing and an examination of our holding in Teague. Generally, "photographs of a murder victim's body are admissible if they are 'relevant to the issues on trial, notwithstanding their gruesome and horrifying character.'" State v. Carter, 114 S.W.3d 895, 902 (Tenn. 2003) (quoting Banks, 564 S.W.2d at 950-51). While the Rules of Evidence govern the admissibility of photographs at trial, Tennessee Code Annotated section 39-13-204(c) controls the admission of evidence in the sentencing hearing of a capital case. The statute allows for the admission of evidence on "any matter that the court deems relevant to the punishment" including, but not limited to, "the nature and circumstances of the crime . . . regardless of its admissibility under the rules of evidence." Tenn. Code Ann. § 39-13-204(c) (emphasis added); see also Carter, 114 S.W.3d at 903 (noting that, under the statute, "any evidence relevant to the circumstances of the murder, the aggravating circumstances relied upon by the State, or the mitigating circumstances is admissible if such evidence has probative value in the determination of punishment"). Although a trial court may use the Rules of Evidence as guidance in capital sentencing proceedings, Carter, 114 S.W.3d at 903, the rules "should not be applied to preclude introduction of otherwise reliable evidence that is relevant to the issue of punishment, as it relates to mitigating or aggravating circumstances, the nature and circumstances of the particular crime, or the character and background of the individual defendant." Sims, 45 S.W.3d at 14. Instead, the relevant inquiries for the trial court are the "reliability, relevance, value, and prejudicial effect" of the evidence. Id. The admission of photographs lies within the sound discretion of the trial court and will not be overturned on appeal absent a showing that the trial court abused that discretion. Banks, 564 S.W.2d at 949.

In Teague, the issue was whether a defendant could present exculpatory evidence in a re-sentencing hearing as a means of mitigating his culpability for his crimes. 897 S.W.2d at 249. While holding that a "defendant has the right to present at the [re-]sentencing hearing . . . evidence relating to the circumstances of the crime or the aggravating or mitigating circumstances, including evidence which may mitigate his culpability," id. at 256, this Court also expressed general approval of the State's introduction of "background evidence," setting out guidelines as follows:

[E]vidence of how the crime was committed, the injuries, and aggravating and mitigating factors are admissible. There appears to be no reason why such guidelines, carefully limiting evidence to the essential background, should not apply in capital cases in order to ensure that the jury acts from a base of knowledge in sentencing the defendant.

Id. at 251 (quoting State v. Teague, 680 S.W.2d 785, 787-88 (Tenn. 1984)). Nothing in Teague suggests that photographs of a murder victim at the scene of the crime cannot be

considered "essential background" relevant to the nature and circumstances of the offense. In our view, Exhibit 5 demonstrates "how the crime was committed." The victim's stab wounds illustrate the severity of the attack. See Teague, 897 S.W.2d at 251. Exhibit 6, which depicts the victim clutching a check in her hand, is probative of the State's assertion that the murder was committed while the Defendant was engaged in a robbery, an aggravating circumstance warranting the imposition of the death penalty. Id. In our view, there is no conflict between our determination in Odom II that the photographs were admissible to show the nature and circumstances of the crime and the principle established in Teague.

### C. Abuse of Discretion

The Defendant also argues that the trial court abused its discretion by admitting the photographs because any information conveyed to the jury had already been provided through the testimony of witnesses. While it is true that the photographs may have been cumulative of live testimony, it does not necessarily follow that their admission was improper. For example, this Court has observed that where the jury is without the benefit of the factual background established by the proof during the guilt phase, "the parties are entitled to offer evidence relating to the circumstances of the crime" in order to allow the jury to "ac[t] from a base of knowledge in sentencing the defendant." Carter, 114 S.W.3d at 903 (citations and internal quotation marks omitted). In Carter, we found that when "the photographs corroborate testimony presented at the sentencing hearing, the information sought to be conveyed by the photographs, even if cumulative, is clearly admissible." Id. at 904; cf. State v. Brown, 836 S.W.2d 530, 551 (Tenn. 1992) (upholding the admission at trial of nine photographs of murder victim, despite the fact that "oral testimony . . . graphically describing the [victim's] injuries" was also admitted). In this instance, the jury, as in Carter, had not been exposed to the proof ordinarily introduced during the guilt phase of a capital trial. In the context of the testimony provided, the two photographs at issue allowed the jury to "see for itself what [was] depicted in the photograph[s]." State v. Griffis, 964 S.W.2d 577, 594 (Tenn. Crim. App. 1997). We hold, therefore, that the trial court's admission of the photographs was not an abuse of discretion.

The Defendant also argues that the trial court erred by admitting the photographs in light of the factors set out in Banks, 564 S.W.2d at 949. While not explicitly addressing the factors articulated in Banks, the Court of Criminal Appeals generally found that the photographs' "admission was appropriate under the criteria set out." Odom, 2010 Tenn. Crim. App. LEXIS 223, at *55.

In Banks, this Court ruled that "certain factors are to be considered by the trial judge" when determining the admissibility of photographs of a murder victim for the purposes of trial, including

the value of photographs as evidence, that is, their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a *prima facie* case of guilt or to rebut the defendant's contentions. If the inflammatory nature of the photograph is thus outweighed, it is admissible.

564 S.W.2d at 951. The Court commented on the difficulty of establishing that the probative value of particularly gruesome photographs outweighs their prejudicial effect and observed that the State's burden on this matter is often difficult to meet "[i]n the presence of an offer to stipulate the facts shown in the photograph." Id.

While the Defendant asserts that his offer to stipulate to the facts reflected in the photographs means that they were improperly admitted under Banks, this standard applies only during the guilt phase of the trial under the more rigid guidelines established by our Rules of Evidence. See Banks, 564 S.W.2d at 949-51. Although the Rules may serve as a guide in determining the admissibility of evidence in capital sentencing hearings, "[t]rial judges are not . . . required to adhere strictly" to them during a sentencing hearing because they "are too restrictive and unwieldy in the arena of capital sentencing." Sims, 45 S.W.3d at 14. We hold, therefore, that the trial judge did not err by admitting these photographs during the penalty phase of the trial.

### 4. Parole Instruction and Abuse of Prosecutorial Discretion

The Defendant argues that the trial court's instruction to the jury that if the Defendant was sentenced to life imprisonment, he would be eligible for parole after twenty-five years, created a "false choice" in sentencing. He alleges that at the time of the re-sentencing hearing, he had already been imprisoned for seventeen years, meaning that he "would be considered parole-eligible in [eight] years if given a 'life sentence.'" The Defendant argues that by instructing the jury as it did, "the trial court effectively eliminated a reasonable alternative sentence to the death penalty," which violated his right to due process of law and heightened reliability under the federal and state constitutions. The State responds that the Defendant's argument "flies in the face" of the proof he presented during sentencing, which indicated that he would not be paroled if he received a life sentence, and that the Defendant "invited any error with regard to the alleged instruction."

The Defendant also asserts that the prosecution should have allowed him to plead to an additional charge, such as rape or robbery, "with the understanding that the sentence for that crime would be added to the 25 calendar years if the jury sentenced him to life in prison." He argues that this also would have "created a reasonable alternative . . . to the

death penalty." The State responds that the possibility of a life sentence gave the jury a reasonable alternative to a sentence of death.

## A. Parole Instruction

At the time of this offense, a sentence of life without the possibility of parole was not an option. The two sentence alternatives were life with the possibility of parole and death.[11] Prior to the re-sentencing hearing, defense counsel objected to the instruction that the Defendant, if sentenced to life imprisonment, would be required to serve at least twenty-five calendar years before being eligible for parole, contending that because of his imprisonment for seventeen years since the commission of the offense, jurors would be less willing to consider a life sentence if the Defendant might be eligible for parole in only eight more years. When, before trial, defense counsel sought permission to question prospective jurors about these concerns, the trial court asked how the jury would know that the Defendant had not been convicted "a month ago for this offense." Defense counsel responded that "we intend to prove to them he was convicted in 1992." The trial court allowed defense counsel to conduct a voir dire on this issue, and two jurors subsequently inquired whether twenty-five years included the time already served by the Defendant. While explaining that the law directed that the jurors be told that a life sentence included eligibility for parole in twenty-five years, the trial court pointed out that other parole-related information was not relevant to sentencing, and that the jury could not "consider [it] in deciding whether or not [the Defendant] should be sentenced to death."

After the proof had been submitted, the trial court charged the jury as follows:

Tennessee law provides that a person convicted of murder in the perpetration of rape shall be punished by death or by imprisonment for life.

---

[11] While Tennessee Code Annotated section 39-13-204(e)(2) (2010) provides that "[t]he jury shall be instructed that a defendant who receives a sentence of imprisonment for life shall not be eligible for parole consideration until the defendant has served at least twenty-five (25) full calendar years of the sentence," as noted by the Court of Criminal Appeals, this instruction was not mandatory until after July 1, 1993. See Act of May 19, 1993, ch. 473, §§ 1, 4, 16, 1993 Tenn. Pub. Acts 824, 825, 829 (amending the capital sentencing law to allow life without parole, to require that the jury be instructed that a defendant sentenced to life with parole would have to serve at least twenty-five years prior to being eligible, and to make these changes applicable to offenses committed on or after July 1, 1993). Because the Defendant committed this offense in 1991, the trial court was not required to give this instruction. Nevertheless, the Defendant does not challenge the instruction on this basis. Because the trial court allowed defense counsel to put on significant evidence demonstrating that the Defendant was almost certain never to obtain parole, the inclusion of the instruction did not result in a sentence that is violative of due process.

A defendant who receives a sentence of imprisonment for life shall not be eligible for parole consideration until the defendant has served at least twenty-five full calendar years of such sentence.

The United States Supreme Court has made the following observations regarding a challenge to jury instructions:

a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction.

Cupp v. Naughten, 414 U.S. 141, 147 (1973) (citations omitted). The key consideration in reviewing a criminal defendant's challenge to a particular instruction, therefore, is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" State v. Rimmer, 250 S.W.3d 12, 31 (Tenn. 2008) (quoting Cupp, 414 U.S. at 147); see also Middleton v. McNeil, 541 U.S. 433, 437 (2004) ("[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation.").

In support of his argument that the trial court's instruction deprived him of due process, the Defendant relies upon two United States Supreme Court decisions: Beck v. Alabama, 447 U.S. 625 (1980) and Simmons v. South Carolina, 512 U.S. 154 (1994). Both of these cases, however, are distinguishable. In Beck, the Alabama law required the jury to either convict a defendant of a capital crime and impose the death penalty or acquit – there was no room for a lesser-included offense instruction. 447 U.S. at 628-29. The Court found that "when the evidence . . . leaves some doubt with respect to an element that would justify conviction of a capital offens[e,] the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." Id. at 637. The Court determined that the state statute "interject[ed] irrelevant considerations into the factfinding process, diverting the jury's attention from the central issue of whether the State has satisfied its burden of proving beyond a reasonable doubt that the defendant is guilty of a capital crime." Id. at 642.

Here, the jury, having received instructions that it could impose either the death penalty or a life sentence with the possibility of parole, was not presented with an "all-or-nothing" choice. While the instruction provided that the Defendant would be eligible for parole after serving twenty-five full calendar years, he was allowed to offer proof

demonstrating that parole was out of the question because of his previous criminal convictions. This evidence went unchallenged by the State.

In Simmons, the prosecution argued the future dangerousness of the defendant in an effort to secure a sentence of death. The trial court refused to instruct the jury that the defendant was ineligible for parole. The Court held that the ruling violated due process and ordered a new sentencing hearing, Simmons, 512 U.S. at 168-69, observing that the defendant "'had no opportunity to deny or explain.'" Id. at 161 (quoting Gardner v. Florida, 430 U.S. 349, 362 (1977)). Unlike Simmons, this is not a case where the Defendant had no opportunity to present evidence that he would never be released on parole. Instead, defense counsel presented the testimony of Ms. Shettles and Tim Terry, both of whom explained that the Defendant had little chance to ever receive parole in Tennessee, and that even if he did, he would immediately be sent back to Mississippi to finish serving his life sentence for the murder conviction there.

While it is true that the prosecution here argued that a factor for the jury to consider in sentencing was "protect[ing] people like Mina Johnson from [the Defendant]," any due process concerns were cured, not only by the evidence presented by the defense, but the instructions of the trial court. See Simmons, 512 U.S. at 169 ("Because truthful information of parole ineligibility allows the defendant to deny or explain the showing of future dangerousness, due process plainly requires that he be allowed to bring it to the jury's attention by way of argument by defense counsel or an instruction from the court.") (internal quotation marks omitted). In our view, the instruction did not violate the Defendant's due process rights.

**B. Abuse of Prosecutorial Discretion**

The Defendant argues that the prosecution abused its discretion by failing to extend a plea offer in this case to an additional charge, such as rape or robbery, which he argues would have presented the jury with a "reasonable alternative" to the death penalty. The jury, however, was presented with an alternative to the death penalty, namely, life imprisonment with the possibility of parole. Further, while the Rules of Criminal Procedure state that "[t]he district attorney general and the defendant's attorney . . . may discuss and reach a plea agreement," Tenn. R. Crim. P. 11(c)(1) (emphasis added), this language is permissive, not mandatory. In addition, "[t]here is no obligation on the part of the State to offer any benefit or advantage to the defendant by reason of entering a guilty plea." State v. Hodges, 815 S.W.2d 151, 155 (Tenn. 1991); see also Weatherford v. Bursey, 429 U.S. 545, 561 (1977) (observing that "there is no constitutional right to plea bargain"). This claim, therefore, is without merit.

**5. Mandatory Review Pursuant to Tennessee Code Annotated § 39-13-206**

-28-

## A. The death sentence was not imposed in an arbitrary manner

Constitutional concerns regarding the imposition of the death penalty arise when "'sentencing procedures . . . create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner.'" Zant v. Stephens, 462 U.S. 862, 910 (1983) (Marshall, J., dissenting) (quoting Godfrey v. Georgia, 446 U.S. 420, 427 (1980)). The United States Supreme Court has held that these concerns can be alleviated by "a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." Gregg v. Georgia, 425 U.S. 153, 195 (1976). Tennessee's capital sentencing procedures have been upheld as satisfying these constitutional requirements. State v. Kiser, 284 S.W.3d 227, 271 (Tenn. 2009).

The Defendant argues that the cumulative effect of the following errors resulted in a "deviatio[n] from applicable statutes and procedural rules" such that his death sentence was arbitrarily imposed: (1) the trial court's dismissal of a prospective juror for cause; (2) the admission of photographs of the victim's body at the crime scene; (3) the prosecutor's highlighting of the victim's age, frailty, and helplessness during closing argument; (4) the prosecution's "urg[ing] the jury to weigh non-statutory factors as part of the aggravation in this case"; (5) the trial court's charge to the jury concerning parole; (6) the fact that the Defendant "was not informed that he had a limited privilege against self-incrimination if he testified about mitigation in the sentencing hearing"; and (7) the trial court's use of a reasonable doubt instruction "whose further use this Court has discouraged." The State asserts that there was no error as to these issues, and that because the sentencing hearing adhered to the applicable statutes and procedural rules, the sentence was not imposed in an arbitrary manner.

We have previously determined that there was no error as to the first five issues presented in support of the Defendant's argument that his death sentence was arbitrarily imposed, and our review of the record confirms that the trial court correctly adhered to the procedural guidelines required in a capital sentencing hearing. As to issues six and seven, we agree with the Court of Criminal Appeals' ruling that there was no error, and that the Defendant is not entitled to relief on either basis.[12] We conclude that because the sentencing

---

[12] As to issue six, the Court of Criminal Appeals previously found that the Defendant chose not to testify at this sentencing hearing because he did not have the benefit of evidence he would have allegedly obtained through a discovery request that had been denied in an earlier proceeding. See State v. Odom, No. W2006-00716-CCA-R10-DD, 2007 Tenn. Crim. App. LEXIS 305, at *15 (Tenn. Crim. App. Apr. 13, 2007). While conceding that his "'colloquies with counsel and the court ostensibly satisfied the procedural requirements of Momon[v. State, 18 S.W.3d 152 (Tenn. 1999)],'" the Defendant argued that his waiver of the right to testify at the sentencing hearing was not knowing, intelligent and voluntary because he was "not advised that if he chose to testify about collateral mitigating circumstances he could not be cross-examined

(continued...)

hearing was performed in accordance with this state's statutory mandates and procedural rules regarding capital sentencing hearings, the Defendant's death sentence was not arbitrarily imposed.

### B. The evidence establishes aggravating circumstances

"In determining whether the evidence supports the application of the aggravating circumstances, the proper standard to consider is whether, after reviewing the evidence in a light most favorable to the State, a rational trier of fact could have found the existence of the aggravating circumstances beyond a reasonable doubt." State v. Stevens, 78 S.W.3d 817, 841 (Tenn. 2002). The two aggravating circumstances submitted by the State were the Defendant's prior violent felony, see Tenn. Code Ann. § 39-13-204(i)(2), and that the murder was committed during an attempt to commit robbery, see Tenn. Code Ann. § 39-13-204(i)(7). In support of the (i)(2) aggravating circumstance, the jury was presented with evidence of the Defendant's conviction for the 1978 murder of Becky Roberts in Mississippi. The Defendant did not dispute the judgment of conviction for that crime. The Defendant's statement to the police was offered in support of the (i)(7) aggravating circumstance. He admitted that he had planned to steal the victim's purse. He also admitted to looking through the purse for something of value. This evidence establishes a basis for the jury's finding that the (i)(7) aggravating circumstance was established beyond a reasonable doubt. Cf. State v. Keen, 31 S.W.3d 196, 206-08 (Tenn. 2000) (finding that defendant's statement, and inferences gleaned from it, established a reasonable basis for the jury's finding of the "especially heinous, atrocious or cruel" aggravating circumstance). Under these

---

[12](...continued)
about the crime unless he opened the door." Odom, 2010 Tenn. Crim. App. LEXIS 223, at *90, *94. Although decided after this sentencing hearing, our opinion in Rimmer held that a criminal defendant does not have to be informed that he will not waive his privilege against self-incrimination if he testifies to collateral mitigating factors in a capital sentencing hearing. 250 S.W.3d at 28. In Rimmer, we observed that "the Defendant has not cited, and we have not found, a case from any other jurisdiction that requires a defendant to acknowledge his awareness of a limited cross-examination rule" before waiving his right to testify at a capital sentencing hearing. Id. Similarly, the Defendant in this appeal has not pointed us to any authority justifying a different result. Accordingly, we find that our intermediate court correctly determined that the Defendant is not entitled to relief on this issue.

As to issue seven, the Defendant challenged the portion of the trial court's jury instruction providing that "[r]easonable doubt does not mean a doubt that may arise from possibility." Odom, 2010 Tenn. Crim. App. LEXIS 223, at *95. While we noted in Rimmer that "the language of this particular instruction may not be helpful," and subsequently discouraged its use, 205 S.W.3d at 31, this opinion was, as noted above, released after the Defendant's sentencing hearing in this case, and therefore "the trial court was not privy to [our] advice on continued use of this instruction." Odom, 2010 Tenn. Crim. App. LEXIS 223, at *98. The Court of Criminal Appeals concluded that, because this instruction had been upheld on numerous occasions prior to our opinion in Rimmer, its use in the sentencing hearing did not result in a violation of the Defendant's due process rights. Id. at *98-99.

-30-

circumstances, a rational trier of fact could have found the (i)(2) and (i)(7) aggravating circumstances beyond a reasonable doubt.

## C. The evidence establishes that the aggravating circumstances outweigh any mitigating circumstances

The Defendant argues that the mitigating circumstances of his difficult childhood and his rehabilitation while in prison are not outweighed by the two aggravating circumstances found by the jury. He contends that a rehabilitated inmate "cannot be among the 'worst' murderers for whom the death penalty is intended" and that his death sentence should be modified to one of life imprisonment as a result. Additionally, he argues that the Court should use a de novo standard of review in determining the weight to be given the aggravating and mitigating circumstances. In response, the State contends that the evidence clearly supports the jury's weighing of the aggravating and mitigating circumstances.

The standard consistently utilized by this Court to review a capital sentencing jury's weighing of the aggravating and mitigating circumstances is "whether, after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found that the aggravating circumstance[s] outweighed the mitigating circumstance[s] beyond a reasonable doubt." State v. Stephenson, 195 S.W.3d 574, 593 (Tenn. 2006); see also State v. Reid, 164 S.W.3d 286, 314 (Tenn. 2005); accord State v. Woods, 23 P.3d 1046, 1075 (Wash. 2001) (noting that in "determin[ing] whether there was sufficient evidence to justify the affirmative finding that there were not sufficient mitigating circumstances to merit leniency," the reviewing court must "ask whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found sufficient evidence to justify that conclusion beyond a reasonable doubt").

The Defendant claims that because the imposition of a death sentence ultimately turns on the weighing of the aggravating and mitigating circumstances, de novo review is warranted in order to ensure that only those criminal defendants who genuinely deserve the ultimate punishment receive it. While we are mindful of the need for "a greater degree of reliability when the death sentence is imposed," Lockett v. Ohio, 438 U.S. 586, 604 (1978), the Defendant does not cite to any authority in support of his argument that a departure from the traditional standard of review would render more reliable results in the imposition of the death penalty. Further, the statute in question requires that we determine if the evidence supports the jury's findings. See Tenn. Code Ann. § 39-13-206(c)(1)(C). A jury's finding as to the weight of the evidence is entitled to deference. See State v. Davis, 141 S.W.3d 600, 611 (Tenn. 2004) ("Questions concerning the credibility of the witnesses, the weight to be given the evidence, and any factual issues raised by the evidence are resolved by the trier of fact."); State v. Flake, 88 S.W.3d 540, 553 (Tenn. 2002) (noting that it is the jury's responsibility to assess the credibility of witness testimony and the weight of the evidence

(quoting United States v. Barton, 992 F.2d 66, 70 (5th Cir. 1993))).  In Flake, we applied the "rational trier of fact" standard of review to evaluate a jury's rejection of a defendant's insanity defense and observed that, while it is "properly deferential to the finding of the trier of fact," it does "not totally insulate the jury's finding from appellate review," but rather "enhances appellate review by virtue of its similarity to the familiar sufficiency standard which appellate courts are accustomed to applying."  88 S.W.3d at 554.  We hold the same to be true when this standard is used by an appellate court to review the jury's weighing of aggravating and mitigating circumstances in a capital sentencing hearing. Our view is that the current standard of review more properly "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson v. Virginia, 443 U.S. 307, 318-19 (1979).

With this standard in mind, we must address the weighing of the aggravating and mitigating circumstances.  The State proved that the Defendant had murdered Becky Roberts in 1978.  The jury was presented with the judgment of conviction for that crime.  The State also presented evidence that the Defendant murdered the victim in this case during a robbery. The State submitted photographic and testimonial evidence describing the nature and circumstances of the crime, which allowed the jury to assess the weight to be given the proffered aggravating circumstances.

In mitigation, the defense presented the Defendant's personal history, which outlined his abandonment by his birth parents and separation from his siblings at a young age.  It illustrated the abusive home life the Defendant experienced as a result of his adoptive mother's remarriage, the emotional rejection he experienced as a child, and his involvement with juvenile authorities in Mississippi.  The defense described his stay at the Columbia Training Center, where two psychological evaluations identified the Defendant's need for psychological treatment, which he never received.  The jury also heard evidence concerning the Defendant's almost spotless record while incarcerated at Riverbend, where he received his GED and a paralegal certification, worked as a teacher's aide, participated in a variety of classes, and engaged in arts and crafts.  Several parties who had come into contact with the Defendant during his incarceration testified to the Defendant's efforts at self-improvement and his capacity for rehabilitation in a structured prison environment.  The jury also heard from Dr. Joseph Angelillo, who believed the Defendant suffered from "schizoid personality features" and opined that the Defendant had the capacity to do well in the prison environment.  The State rebutted this evidence by describing the Defendant's escape from prison and his prior theft and robbery convictions, both of which were committed after his escape.

While the defense offered extensive proof of circumstances in mitigation of the crime, the two aggravating circumstances were firmly established by the evidence. The State also presented evidence that the jury could have used to assess the weight to be given the aggravating and mitigating circumstances. As a result, there was a sound basis for the jury's determination that the aggravating circumstances outweighed the mitigating ones beyond a reasonable doubt.

## D. The sentence of death is not excessive or disproportionate to the penalty imposed in similar cases

The Defendant argues that, because of his status as a rehabilitated inmate, his execution would be aberrant, and that the causal connection between his early life experience and his later criminal behavior diminishes his culpability. The State contends that the death sentence is neither excessive nor disproportionate in light of similar cases in which the penalty has been imposed.

This Court's proportionality review begins with a presumption that the sentence "is not disproportionate to the crime in the traditional sense;" however, we must inquire as to whether "the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime." Reid, 213 S.W.3d at 820 (internal quotation marks omitted); see also Terry, 46 S.W.3d at 163. "'[T]he pool of cases considered by this Court . . . includes those first degree murder cases in which the State seeks the death penalty, a capital sentencing hearing is held, and the sentencing jury determines whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death.'" Reid, 213 S.W.3d at 820 (quoting Davis, 141 S.W.3d at 620). The Court's function in this review is not limited to those cases which are "perfectly symmetrical," but rather to "identify and to invalidate the aberrant death sentence." Terry, 46 S.W.3d at 164 (citation omitted). "Before we may hold that the death sentence received by the Defendant was disproportionate, we must find that the facts of this case are 'plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed.'" Rimmer, 250 S.W.3d at 34 (quoting Reid, 213 S.W.3d at 820).

There is no formula for comparing similar cases; however, this Court generally looks to the following factors regarding the offense:

(1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims.

Reid, 213 S.W.3d at 820 (quoting Davis, 141 S.W.3d at 620). As to the defendant, this Court considers the following factors: "'(1) prior criminal record, if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation.'" Id.

Here, the Defendant sought out an elderly victim and murdered her in the course of a robbery. This Court has, on numerous occasions, upheld the death sentences of defendants where an elderly victim was attacked and killed during the course of a robbery or burglary. See State v. Rollins, 188 S.W.3d 553 (Tenn. 2006); State v. Leach, 148 S.W.3d 42 (Tenn. 2004); State v. Mann, 959 S.W.2d 503 (Tenn. 1997); State v. Smith, 893 S.W.2d 908 (Tenn. 1994); State v. Van Tran, 864 S.W.2d 465 (Tenn. 1993); State v. McNish, 727 S.W.2d 490 (Tenn. 1987).

As stated, the State proved two aggravating circumstances. See Tenn. Code Ann. § 39-13-204(i)(2) and (i)(7). We have previously upheld death sentences where the murder was committed in the course of a robbery or burglary and where there was at least one other aggravating circumstance. See Carter, 114 S.W.3d at 895; State v. Chalmers, 28 S.W.3d 913 (Tenn. 2000); State v. Cribbs, 967 S.W.2d 773 (Tenn. 1998); State v. Cazes, 875 S.W.2d 253 (Tenn. 1994); State v. Barber, 753 S.W.2d 659 (Tenn. 1988); State v. Coleman, 619 S.W.2d 112 (Tenn. 1981).

Evidence was presented showing that the Defendant had a troubled upbringing, spent time in the custody of juvenile authorities, never received recommended psychological treatment, and suffered from "schizoid personality features" as an adult. We have upheld the death sentences of other defendants who experienced similarly troubled childhoods and were affected adversely by these experiences. Schmeiderer, 319 S.W.3d at 607 (affirming death sentence where defendant was shown no affection during his childhood, was housed in a juvenile facility from ages fifteen to eighteen, and had not received treatment advised by a psychiatric evaluator); Leach, 148 S.W.3d at 42 (upholding death sentence where mitigation showed that defendant was neglected as a child, physically and sexually abused from childhood through his adult years in prison, and suffered from low self-esteem, depression, and suicidal tendencies); State v. Keen, 31 S.W.3d 196 (Tenn. 2000) (affirming death sentence where defendant grew up in an extremely abusive home until the age of four, at which point he was adopted, and never received recommended psychological care); State v. Blanton, 975 S.W.2d 269 (Tenn. 1998) (affirming defendant's death sentence despite mitigating evidence that defendant was abused by his father as a child and grew up under difficult familial and economic circumstances); State v. Hines, 919 S.W.2d 573 (Tenn. 1995) (affirming death sentence of defendant who experienced a troubled childhood, during which

his father abandoned him and his mother was an alcoholic, and he suffered from paranoid personality disorder and chronic depression).

In the course of the proportionality review, our Court of Criminal Appeals did not specifically address the mitigating circumstance of rehabilitation. The Defendant offered proof of a significant period of good behavior during his years of incarceration, which was bolstered by the testimony of several individuals who believed that he had significantly improved himself while he was imprisoned and would continue to thrive in the structured environment of Riverbend. The Defendant also obtained his GED, along with several other certifications, and engaged in a variety of constructive activities within the prison system. We have identified, however, several cases in which death sentences have been upheld despite evidence of rehabilitation during a term of imprisonment. For instance, in State v. Austin, 87 S.W.3d 447 (Tenn. 2002), the defendant hired another person to kill the victim, was convicted of murder, and subsequently sentenced to death. Id. at 457. In a re-sentencing hearing taking place several years after the initial trial, the defendant presented evidence that he was "a model prisoner and a man of good character" who had only "one minor disciplinary write-up in his twenty-two years on death row and had achieved the highest classification level possible based on good behavior." Id. at 458. The Defendant also worked as a teacher's aide and tutored fellow inmates in preparation for the GED. Id. Two guards testified that the defendant helped save their lives during a prison riot. Id. Despite these mitigating factors, this Court upheld the sentence of death. Id. at 467; see also Stephenson, 195 S.W.3d at 584 (affirming after re-sentencing hearing death sentence of defendant who was described as "cream of the crop," completed paralegal and construction training courses, served as inmate advisor on disciplinary board, spoke to troubled youth, was an ordained minister, participated in religious programs, and played in multi-racial gospel band); State v. Cauthern, 967 S.W.2d 726 (Tenn. 1998) (affirming after re-sentencing hearing death sentence of defendant who obtained his GED and paralegal certification while at Riverbend, served as a teacher's aide, made greeting cards, and introduced statements from prison officials and teachers attesting to his positive attitude and behavior).

After carefully reviewing the record and the pertinent case law, we conclude that the Defendant's case is not "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." Rimmer, 250 S.W.3d at 36 (quoting Davis, 141 S.W.3d at 620).

### 6. Recusal

The Defendant argues that Judge John Everett Williams, who served on the panel of the Court of Criminal Appeals, should have granted the motion to recuse because of his prior

disapproval of the full amount of compensation sought by his appellate counsel.[13] The Defendant maintains that Judge Williams' participation in the case "created an appearance of having prejudged the merits of [his] appeal, [or] of harboring bias against the Defendant . . . or [his] counsel." He further contends that Judge Williams failed to apply the standard required by Tennessee Supreme Court Rule 10, Canon 3E(1), which provides, in pertinent part, that "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned." The Defendant claims that Judge Williams' use of a subjective standard violated his "state and federal rights to due process of law and heightened due process," as well as his Eighth Amendment right to meaningful appellate review. In response, the State describes the Defendant's assertions as an intemperate reaction to an adverse ruling – and insufficient grounds for recusal. See Keisling v. Keisling, 92 S.W.3d 374, 380 (Tenn. 2002).

"'The right to a fair trial before an impartial tribunal is a fundamental constitutional right.'" Bd. of Prof'l Responsibility v. Slavin, 145 S.W.3d 538, 548 (Tenn. 2004) (quoting Austin, 87 S.W.3d at 470). The Tennessee Constitution provides that "[n]o judge . . . shall preside on the trial of any cause in the event of which he may be interested." Tenn. Const. art. VI, § 11; cf. Tumey v. Ohio, 273 U.S. 510, 523 (1927) ("[I]t certainly violates the Fourteenth Amendment and deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case."). The purpose of this constitutional protection "'is to guard against the prejudgment of the rights of litigants and to avoid situations in which the litigants might have cause to conclude that the court had reached a prejudged conclusion because of interest, partiality or favor.'" Slavin, 145 S.W.3d at 548 (quoting State v. Benson, 973 S.W.2d 202, 205 (Tenn. 1998)). As a result, recusal is necessary in some instances in order to preserve the public confidence in judicial neutrality and impartiality. See Slavin, 145 S.W.3d at 548. The test in determining whether recusal is necessary is an objective one, "'since the appearance of bias is as injurious to the integrity of the judicial system as actual bias.'" Id. (quoting Davis v. Liberty Mut. Ins. Co., 38 S.W.3d 560, 565 (Tenn. 2001)); see also Reid, 213 S.W.3d at 815 (quoting Davis, 38 S.W.3d at 565); accord Caperton v. A.T. Massey Coal Co., __ U.S. __, __, 129 S. Ct. 2252, 2262 (2009) ("The inquiry [regarding recusal] is an objective one. The Court asks not whether the judge is actually, subjectively biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'"). Under this objective test, recusal becomes necessary "'when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality.'" Reid, 213 S.W.3d at 815

---

[13] Judge Alan Glenn authored the unanimous opinion of the Court of Criminal Appeals. Judge J.C. McLin also served on the panel with Judge Williams. See Odom, 2010 Tenn. Crim. App. LEXIS 223.

(quoting <u>Alley v. State</u>, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994)); <u>Slavin</u>, 145 S.W.3d at 548; <u>see also</u> Tenn. Sup. Ct. R. 10, Canon 3E(1).  This decision is left to the sound discretion of the judge whose recusal is sought and will not be disturbed on appeal unless "clear abuse appears on the face of the record."  <u>Reid</u>, 213 S.W.3d at 815; <u>see also</u> <u>Bean v. Bailey</u>, 280 S.W.3d 798, 805 (Tenn. 2009).

The Defendant's appellate attorneys, Brock Mehler and Gerald Skahan, sought Judge Williams' disqualification after he reduced the amount of their compensation application by $4,305 and $3,372, respectively.[14]  In the order denying relief, Judge Williams found that the motion for recusal was "predicated on grounds that cannot be supported pursuant to Tennessee Supreme Court Rule 10, Canon 3E."  He explained that the "primary reason" for reducing attorney Skahan's compensation was because much of the research for which compensation was sought involved issues that either "were never addressed or thought sufficient to be included in this appeal."  Attorney Mehler's compensation was reduced because Judge Williams "concluded that some of the hours claimed seemed excessive to complete the task and some work appeared duplicitous."  While Judge Williams pointed out that he had formed no opinion concerning the merits of the Defendant's appeal and otherwise expressed "high regard" for both attorneys, the order "question[ed] the reasonableness of the time they expended."  The order further provided that, after the opinion by the Court of Criminal Appeals had been filed, counsel could "request the authoring judge to review all fee petitions filed in this case," as Judge Williams felt that he "may be in a better position to determine the reasonableness of the fee than I was when I was asked to review it initially."

In our view, Judge Williams evaluated the motion for recusal as required by Tennessee Supreme Court Rule 10, Canon 3E, which directs the use of an objective test in questions of recusal.  While it is defense counsel's prerogative to challenge the propriety of the denial of the full amount of the fees sought, it does not follow that the Defendant was deprived of an impartial judge on the panel of the Court of Criminal Appeals.  The issues are separate and distinct, and the disposition on one has no bearing on the other.  The order does not reflect prejudice or bias against the Defendant, but merely provides that at the time counsel submitted their claim, Judge Williams could not approve the compensation sought based on his assessment of the hours worked.  While the Defendant's counsel assert that their subsequent motions to reconsider were "unavailing," they are not able to point to any portion

---

[14] Judge Williams authorized compensation in the amount of $5,122.50 for Mehler and $600 for Skahan.

of the record as support for their inference that Judge Williams had somehow displayed prejudice either to them or to the Defendant.[15]

While it is apparent that the Defendant's counsel disagreed with Judge Williams' decision to reduce their compensation, this, without some indication that the reduction was tied to some type of bias or prejudice, does not meet the threshold for recusal. Cf. Bean, 280 S.W.3d at 805-06 (finding that recusal of trial judge was required where it was publicly known that the attorney and the judge had an extensive "acrimonious relationship" and numerous "hostile meetings" had taken place between the judge and members of the attorney's law firm). This Court has previously ruled that "the mere fact that a judge has ruled adversely to a party . . . is not grounds for recusal" because "[i]f the rule were otherwise, recusal would be required as a matter of course since trial courts necessarily rule against parties . . . in every case." Davis, 38 S.W.3d at 565; see also Keisling, 92 S.W.3d at 380; Alley, 882 S.W.2d at 821 ("Rulings of a trial judge, even if erroneous, numerous and continuous, do not, without more, justify disqualification."). As indicated, nothing in this record suggests that Judge Williams' failure to approve the entire amount of compensation sought by the Defendant's counsel was based on anything other than his determination that the time spent researching certain issues was unreasonable. See Hines, 919 S.W.2d at 578-79 (holding that where the trial judge "stated that he was not prejudiced against the defendant" and there was "no indication in the record" that the rejection of the defendant's plea agreement was a biased decision against him, recusal was not warranted). Because the Defendant has failed to establish that prejudice or bias on the part of Judge Williams affected his ability "to render an impartial decision," id. at 579, his refusal to grant the motion to recuse does not qualify as an abuse of discretion. See State v. Ferrell, 277 S.W.3d 372, 378 (Tenn. 2009) ("The abuse of discretion standard contemplates that before reversal the record must show that a judge 'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" (quoting State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999))).

**Conclusion**

We hold that (1) the Defendant's right to a fair and impartial jury was not violated by the disqualification of a prospective juror; (2) the prosecutor's closing argument did not result in the erroneous injection of non-statutory aggravating factors into the weighing process warranting reversal of the death sentence; (3) the admission of photographs of the

---

[15] The Defendant's counsel appear to take issue with Supreme Court Rule 13 for several reasons, including the fact that, after their motions to reconsider were denied, they were "left with no recourse because [the Rule] no longer provides for an appeal from the denial of claims for compensation." The mechanics of this Rule, however, are not before us in this appeal; therefore, we are unable to address the merit of their complaints.

body did not constitute error; (4) the trial court's instructions on parole did not violate the Defendant's right to due process of law and heightened reliability; (5) the mandatory criteria of Tennessee Code Annotated section 39-13-206(c)(1) are satisfied; and (6) the reduction of the amount of compensation sought by appellate defense counsel by a judge on the Court of Criminal Appeals did not necessitate the judge's disqualification from participating in the case.

Accordingly, the judgment of the Court of Criminal Appeals is affirmed. The sentence of death shall be carried out on the 13th day of March, 2012, unless otherwise ordered by this Court or other proper authority. It appearing that the Defendant is indigent, the costs of this appeal are taxed to the State.

_____
GARY R. WADE, JUSTICE