# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs December 18, 2013

## STATE OF TENNESSEE v. MICKEY LEE WILLIAMS

**Appeal from the Circuit Court for Grainger County**
**Nos. 3689-IV & 7994-IV      O. Duane Slone, Judge**

---

### No. E2013-01110-CCA-R3-CD - Filed February 4, 2014

---

This case is before this court on a delayed appeal of appellant's 2004 convictions for second degree murder and arson. Appellant received an effective sentence of twenty-four years. Appellant now argues that the trial court erred by (1) allowing a witness to testify about appellant's propensity for violence during the State's case-in-chief; (2) allowing the testimony of a witness when appellant did not have notice of her testimony until two days before the trial; (3) incorrectly instructing the jury on self-defense; and (4) ruling that a defense witness's testimony was irrelevant. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and NORMA MCGEE OGLE, J., joined.

Heather N. McCoy, Sevierville, Tennessee, for the appellant, Mickey Lee Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Tracy L. Bradshaw, Assistant Attorney General; James B. Dunn, District Attorney General; and Charles L. Murphy, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Procedural History and Facts

Appellant was indicted by a Grainger County grand jury on a fourteen-count indictment stemming from the death of Terry Johnson and the circumstances surrounding his death. The State proceeded to trial on first degree murder, arson, and aggravated assault

charges. In his first direct appeal, this court summarized the evidence presented at trial as follows:

Around 11:30 A.M. on March 12, 2002, the [a]ppellant and his longtime friend, Billy Joe Coffey, purchased three eighteen packs of beer which they began drinking at Coffey's residence in Rutledge. At approximately 2:30 or 3:00 P.M., the two went to the home of the [a]ppellant's brother, Louis Williams, on Poor Valley Road in Grainger County to play cards and continue in their drinking endeavors. While there, the [a]ppellant professed his love for Patricia Johnson. Johnson lived across the street from Louis Williams, and the [a]ppellant made several visits to the Johnson home that afternoon to see Mrs. Johnson. Coffey and his wife returned the [a]ppellant to his home a little after 7:35 P.M. that evening. Coffey testified that the [a]ppellant had drunk at least a case of beer.

Patricia Johnson, the victim's wife, testified that the [a]ppellant came to her home on the afternoon of March 12th while her husband was away and asked whether "God would forgive him of murder." She responded that murder was wrong. Mrs. Johnson explained that she had developed a romantic relationship with the [a]ppellant around October of 2001 when her husband was on the road for long periods of time as a truck driver and that she had tried to end the relationship in January of 2002 when she told her husband about the affair.

Johnny Bowens, who lived on Poor Valley Road near the Johnsons, testified that the [a]ppellant came to his home on the evening of March 12th and cryptically "told [him] to watch and learn" and to "put it in the newspaper" before going up the road toward the Johnson house. Barbara Bowens, who also lived on Poor Valley Road, received a phone call from the [a]ppellant on the night of the incident, inquiring whether the victim was at his house. She testified that she thought the [a]ppellant was joking when he stated during the conversation that he loved Mrs. Johnson and was going to kill Mrs. Johnson's husband.

Around 9:30 P.M., the [a]ppellant returned to the Johnson home. The victim, Terry Johnson, answered the door, and the two began to argue. Mrs. Johnson testified that her husband asked the [a]ppellant to leave and told the [a]ppellant that they would talk the next day. The [a]ppellant walked out the door but quickly reentered with a six pack of beer, pointing his finger at the victim and calling him a son of a bitch. The [a]ppellant then went back

outside, and the victim followed. Barbara Bowens, Johnny Bowens, and Shawn Bolen, all neighbors on Poor Valley Road, heard what sounded like "a bunch of dogs fighting." Mrs. Johnson heard "grunting noises and thumping outside" and tried to call the police. Johnny Bowens and Bolen both testified that they saw the victim shove the [a]ppellant first while on the porch. The victim was heard telling the [a]ppellant to stay away from his family and get off of [sic] his property. The fight then moved to the yard. Soon thereafter, the victim was seen holding his stomach and retreating to his home with the [a]ppellant following. The [a]ppellant was yelling to the victim that "he [would] put his soul in hell." Mrs. Johnson testified that when her husband came inside, he told her to call the police. "[H]is right arm was cut, and he was holding his arm up, and his left hand was on his chest." Blood was everywhere. The victim went into the bathroom and closed the door. The [a]ppellant then came inside the house and held a knife to Mrs. Johnson's throat and pushed her, along with her fifteen-month-old and five-year-old daughters, into the back bedroom. Afterwards, the [a]ppellant beat on the bathroom door, yelling and screaming. Mrs. Johnson and her two children escaped through a bedroom window and hid in an old truck parked nearby.

Shawn Bolen testified that when he saw what was happening, he went to get the [a]ppellant's brother Steve who lived down the street. The [a]ppellant came out of the Johnson's house, and Steve called out to him. The [a]ppellant walked to Steve's house with blood covering his pants and asked for a cigarette lighter. He made a slicing motion across his throat and said that Terry Johnson was dead and "had gone to hell."

Officer Jeff Daniel with the Rutledge Police Department testified that upon responding to the scene at the Johnson's home, he knocked on the door, but no one answered. There was blood both on the front porch and in the yard. Daniel drove up the road to Steve Williams' house, where Williams and Bolen were on the front porch. The [a]ppellant was standing nearby with a knife in his hand and blood covering his pants. When Officer Daniel asked the [a]ppellant what was going on, the [a]ppellant responded, "I killed him. . . . He hit me. . . . I killed him. . . . And I'm tired of everybody out here." When Daniel tried to question him further, the [a]ppellant walked back across the road to the Johnson's house. Officers at the scene asked the [a]ppellant to come out of the house, but he refused, repeatedly opening and shutting the door. When asked for access to the house to check on the victim, the [a]ppellant replied, "I'll drag him to you." He later announced, "He's too big. I can't drag him." Shortly thereafter, a fire was seen engulfing the interior of

the house, and the [a]ppellant was observed running from the residence. Upon exiting the house, the [a]ppellant ran toward Chief Holt, who ordered the [a]ppellant to drop the knife. The [a]ppellant refused and was shot by Chief Holt.

Approximately four hours after the incident occurred, a blood sample was taken from the [a]ppellant which indicated a blood alcohol level of 0.11 percent. Special Agent Russell Robinson with the State of Tennessee's Bomb and Arson Section investigated the murder and fire. He testified that the fire had multiple points of origin and concluded that it was "intentionally set." During the investigation, Robinson was forced to enter the bathroom through a window because the victim's body was against the door. Additionally, he noted that there were marks on the bathroom door which appeared to be made by a sharp-bladed tool. He found a Bic lighter on the kitchen table and a twenty-two inch hunting knife on the front porch. The victim's blood was found on the [a]ppellant's pants and on the knife. Doctor Cleland Blake performed an autopsy on the victim. He described five deep stab wounds penetrating into the lungs and the vena cava, and he found the cause of death to be internal and external hemorrhaging.

At trial, the [a]ppellant testified that on the night of the incident, he became intoxicated after drinking beer and did not know his purpose in going to the Johnson residence. He related that the victim hit him with a broom and tried to choke him, and, further, that he "didn't have no choice," that he "had to cut at [the victim]" to get him off. Regarding the fire, the [a]ppellant testified that he was "probably trying to kill [himself]. I's panicked, scared. I don't know, really."

*State v. Mickey Lee Williams*, No. E2004-01617-CCA-R3-CD, 2005 WL 2240736, at *1-3 (Tenn. Crim. App. Sept. 15, 2005), *perm. app. denied* (Tenn. Feb. 21, 2006).

Appellant was convicted at trial of second degree murder and arson, and the jury found him not guilty of aggravated assault. The trial court originally sentenced him to twenty-four years and five years, respectively. However, the trial court later modified the murder sentence to twenty-three years. Appellant filed an untimely motion for new trial, which was denied by the trial court. *Id.* at *3. Subsequently, appellant appealed his convictions and sentences to this court, but because his motion for new trial was not timely, this court only considered the sufficiency of the evidence and sentencing issues. *Id.* at *4. This court affirmed his convictions and reinstated his twenty-four-year sentence for second degree murder. *Id.* at *6.

-4-

In April 2006, appellant filed a petition for post-conviction relief. The post-conviction court appointed counsel, and appellant filed an amended petition for post-conviction relief in August 2010. The post-conviction court granted relief in the form of a delayed appeal and gave appellant the opportunity to file a motion for new trial. The court heard the motion for new trial on April 23, 2013, and denied the motion. This appeal follows.

## II. Analysis

### A. Admissibility of Witnesses' Testimonies

#### 1. *Standard of Review*

The determination of whether evidence is admissible at trial is a matter left to the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *State v. Dellinger*, 79 S.W.3d 458, 485 (Tenn. 2002); *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996). "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. All relevant evidence is admissible unless specifically excepted by constitution, statute, rules of evidence, or rules of general application. Tenn. R. Evid. 402. One such exception sets forth that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

#### 2. *Billy Joe Coffey*

Appellant argues that under Tennessee Rule of Evidence 404(b), the trial court erred by allowing the State to elicit testimony from Billy Joe Coffey during its case-in-chief regarding appellant's propensity for violence. The State agrees with appellant that the trial court erred but contends that the issue is better analyzed under Tennessee Rule of Evidence 404(a). The State further contends that the error was harmless. We agree with the State in all regards.

In this case, the State paused its re-direct examination of Billy Joe Coffey to ask the trial court, in a bench conference, for permission to question Mr. Coffey about appellant's behavior when he was inebriated, whether he was peaceful or violent. Appellant's counsel objected, arguing that the testimony would be a reference to a prior bad act, but the trial court allowed the questioning. The trial court ruled that appellant had raised the issue of self-

defense in his opening statement and agreed with the State that Mr. Coffey's testimony was relevant to the question of whether appellant or the victim was the first aggressor. The following exchange then occurred:

> PROSECUTOR: Mr. Coffey, when the Defendant's drinking[,] what kind of - would you say he's a peaceful man or a fighting man?
>
> COFFEY: Most time he's peaceful.
>
> PROSECUTOR: Does he ever have a reputation for being otherwise when he's drinking?
>
> COFFEY: If he gets mad, you know. Somebody makes him mad or something.
>
> PROSECUTOR: Somebody makes him mad, he gets - he's a fighting man; is that correct?
>
> COFFEY: Yeah. Yeah.

In general, evidence of an accused's "pertinent trait of character" or his prior bad acts is not admissible to prove "action in conformity" with that character trait. *See* Tenn. R. Evid. 404(a), (b). There are exceptions, however, to the general rule, and the application of the exceptions depends on whether the evidence is offered under Rule 404(a) or 404(b). In this case, the State argues that the admission of Mr. Coffey's testimony should be analyzed under Rule 404(a), and we agree because Mr. Coffey testified as to appellant's general character, not a specific prior bad act, which would fall under Rule 404(b).

Rule 404(a)(1) provides that an accused may present evidence of his own character and that the prosecution may present character evidence to rebut that presented by the accused. In addition, if an accused offers evidence under Rule 404(a)(2) regarding the character of the victim, the prosecution may present evidence that the accused had the same character trait as the victim. *See* Tenn. R. Evid. 404(a)(1). Thus, when a defendant raises a self-defense claim and alleges that the victim was the first aggressor, the State may present evidence that the victim had a peaceful character. *See State v. Copenny*, 888 S.W.2d 450, 455 (Tenn. Crim. App. 1993). Furthermore, when a defendant accuses the victim of being aggressive or violent, for example, the State may introduce character evidence that the defendant was also violent. *See State v. Jason Allen Cobb*, No. W2011-02437-CCA-R3-CD, 2013 WL 1223386, at *13 (Tenn. Crim. App. Mar. 26, 2013). However, the State may only

introduce such character evidence in rebuttal, not in its case-in-chief. *Copenny*, 888 S.W.2d at 455.

It is clear that the trial court erred by allowing the State to present character evidence during its case-in-chief; however, we must determine whether the error more probably than not affected the verdict. *See* Tenn. R. App. P. 36(b). Here, appellant presented a self-defense claim during his case-in-chief, contending that the victim was the first aggressor. Consequently, Mr. Coffey's testimony about his observations of appellant's being a "fighting man" when he was mad would have been admissible during the State's rebuttal. Furthermore, appellant presented evidence in his case-in-chief about his alcohol use and his violent tendencies, and the evidence of appellant's guilt was overwhelming. Thus, we conclude that the error in the admission of the character evidence would have had no impact on the jury's decision. Appellant is without relief as to this issue. *See* Tenn. R. App. P. 36(b).

### 3. Barbara Bowens

Appellant contends that the trial court erred by allowing the testimony of Barbara Bowens when he had only learned two days prior to trial that the State intended to call her to testify. The State responds that appellant has not shown that the trial court abused its discretion in allowing her testimony.

Tennessee Code Annotated section 40-17-106 directs the district attorneys general to endorse each indictment with the names of the witnesses the State intends to summon in the matter. "The purpose of this statute is to prevent surprise to the defendant at trial and to permit the defendant to prepare his or her defense to the State's proof." *State v. Kendricks*, 947 S.W.2d 875, 883 (Tenn. Crim. App. 1996). However, the statute is directory in nature, not mandatory. *See id.* (citing *State v. Harris*, 839 S.W.2d 54, 69 (Tenn. 1992)). Thus, a witness is not automatically disqualified from testifying if the State did not include her name on the indictment. *Id.* To obtain relief, a defendant "must demonstrate prejudice, bad faith, or undue advantage," but the decision of whether to allow a witness to testify is left to the sound discretion of the trial judge. *Id.* "'In this context, it is not the prejudice which resulted from the witness' testimony but the prejudice which resulted from the defendant's lack of notice which is relevant to establish prejudice.'" *Id.* (quoting *State v. Jesse Eugene Harris*, No. 88-188-III, 1989 WL 60393, *4 (Tenn. Crim. App. June 7, 1989)).

In this case, the trial court ruled that appellant would not be prejudiced by allowing Barbara Bowens to testify. It noted that the prosecutor had not known that she was a witness until just before trial and that appellant's counsel had the opportunity to interview her. On appeal, appellant contends that he was prejudiced because Ms. Bowens was the only person

whose testimony tended to indicate that appellant had a preconceived plan to kill the victim and because the late notice did not allow the defense to obtain telephone records that might have impeached her testimony. However, any prejudice from her testimony is not relevant to establish prejudice from lack of notice. *See Kendricks*, 947 S.W.2d at 883. Furthermore, appellant has not shown that he would have been able to obtain the telephone records had he known about Ms. Bowens's testimony earlier,[1] and he has not shown that the State acted in bad faith or had undue advantage because of the late notice. Therefore, we conclude that the trial court did not abuse its discretion by allowing the State to present Ms. Bowens's testimony.

### *4. Richard McElhaney*

Appellant contends that the trial court erred by not allowing him to present the testimony of Richard McElhaney on grounds of relevancy.[2] The State responds that the trial court did not abuse its discretion because Mr. McElhaney's testimony was irrelevant. At trial, appellant's counsel proffered that Mr. McElhaney would have testified that appellant's sister approached him with concerns about appellant's safety. Counsel stated that the purpose of the testimony was to bolster the testimony of appellant's sister, who would be testifying during appellant's case-in-chief. The trial court ruled that it would allow counsel to question appellant's sister with regard to her concerns but that Mr. McElhaney's testimony was irrelevant. On appeal, appellant argues that Mr. McElhaney's testimony "would make it more probable that [appellant] acted in self-defense." However, under the circumstances of the case, we fail to see how Mr. McElhaney's testimony would have supported appellant's defense when he could only testify about what appellant's sister told him. Therefore, we conclude that the trial court did not abuse its discretion by disallowing this testimony. Appellant is without relief as to this issue.

### B. Jury Instructions

On appeal, appellant challenges the trial court's instructions to the jury regarding self-defense. It is undisputed that when the trial court initially instructed the jury, the court instructed the jury that appellant would have been acting in self-defense if he reasonably feared death. The court failed to inform the jury that appellant could have properly acted in self-defense if he reasonably feared serious bodily injury. Appellant contends that the trial

---

[1] When the matter was raised in the motion for new trial hearing, the State contended that the telephone records did not exist because of the length of time that had passed.

[2] We glean from the record that Mr. McElhaney was a former police officer or law enforcement agent in some capacity.

court did not cure its error in omitting fear of serious bodily injury from the instruction when it subsequently told the jury that fear of serious bodily injury should also be considered in addition to fear of death and when it partially corrected the written instructions.[3] The State responds that the trial court's attempt to cure its instructions was sufficient. We agree with the State.

At trial, defendants have a '"constitutional right to a correct and complete charge of the law."' *State v. Wendy Nicole Garrison*, E2011-00496-CCA-R3CD, 2012 WL 3079238, at *6 (Tenn. Crim. App. July 27, 2012) (quoting *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990)). "A defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the trial court." *State v. Phipps*, 883 S.W.2d 138, 149-50 (Tenn. Crim. App. 1994) (citing *Casey v. State*, 491 S.W.2d 90, 94 (Tenn. Crim. App. 1972)). Questions regarding the propriety of jury instructions are mixed questions of law and fact; thus, our standard of review is de novo with no presumption of correctness. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

On appeal, this court will only invalidate a jury instruction if, "when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995). "A challenge to a single jury instruction must be judged in context of the entire jury charge." *State v. Bonam*, 7 S.W.3d 87, 89 (Tenn. Crim. App. 1999). When reviewing a challenge to a particular jury instruction on appeal, the key consideration is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *State v. Odom,* 336 S.W.3d 541, 568 (Tenn. 2011), *cert. denied*, 132 S. Ct. 397, 181 L. Ed. 2d 255 (U.S. 2011) (quoting *State v. Rimmer*, 250 S.W.3d 12, 31 (Tenn. 2008)). A charge that results in prejudicial error is one that fails to fairly submit the legal issues to the jury or misleads the jury about the applicable law. *Wendi Nicole Garrison*, 2012 WL 3079238, at *6 (citing *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997)).

The self-defense statute, as it stood at the time of the offenses *sub judice*, stated that a defendant "must have a reasonable belief that there is an imminent danger of death or serious bodily injury" in order to be justified in using force against another person. Tenn. Code Ann. § 39-11-611 (1997). In this case, the trial judge at first omitted the serious bodily injury portion of the self-defense instruction, but when the omission was brought to the

---

[3] According to the parties' briefs, the judge corrected the written instructions by adding fear of serious bodily injury in two locations but missed three others. The written instructions are not included in the record; therefore, appellant has waived any argument with respect to deficiencies in the written instructions. *See State v. Ballard*, 855 S.W.2d 557, 560-61 (Tenn. 1993); Tenn. R. App. P. 24(b).

court's attention, the judge instructed the jury that it should consider fear of serious bodily injury in addition to death.  We conclude that the trial court's correction, along with the remainder of the self-defense instruction, fairly submitted the legal issue without being misleading.  Therefore, appellant is without relief as to this issue.

## CONCLUSION

Based on the record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE